# IN THE SUPREME COURT OF IOWA

No. 14–0029

Filed December 11, 2015

Amended February 23, 2016

**IN THE MATTER OF PROPERTY SEIZED FROM ROBERT PARDEE,**

**ROBERT PARDEE,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Poweshiek County, Randy DeGeest and Joel D. Yates, Judges.

A claimant in a forfeiture proceeding seeks further review of a court of appeals decision upholding the denial of his motion to suppress. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Nicholas Sarcone of Stowers & Sarcone PLC, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, and Rebecca L. Petig, County Attorney, for appellee State.

**MANSFIELD, Justice**.

This forfeiture case asks us to consider the constitutionality of a narcotics dog sniff that occurred after the completion of about a twenty-five-minute traffic stop on Interstate 80. Appellant Robert Pardee was a passenger in an out-of-state vehicle that had been pulled over for mundane traffic violations as part of a criminal interdiction effort. The state trooper, in addition to preparing warnings for the traffic violations, conducted extensive questioning of both the driver and Pardee. Following that questioning, the trooper initially said the occupants were free to go, but then decided to detain them while a narcotics dog was called in. The narcotics dog alerted on the car, and a subsequent search of the vehicle uncovered small amounts of marijuana, over $33,000 in cash, and evidence of marijuana dealing.

In the ensuing forfeiture proceeding for the $33,000, Pardee claimed the cash was his, but the district court denied Pardee's motion to suppress based on res judicata from Pardee's criminal proceeding, where Pardee was ultimately acquitted. The district court then ordered the money forfeited. The court of appeals affirmed the denial of the motion to suppress after reaching the merits of the motion. We granted further review.

Before us, Pardee maintains that res judicata does not apply and that the stop violated the United States and Iowa Constitutions because: (1) pretextual traffic stops are unconstitutional, (2) the State's targeting of out-of-state vehicles in its criminal interdiction efforts is a violation of equal protection, (3) the trooper unconstitutionally prolonged and expanded the stop beyond what was necessary to address the traffic violations, and (4) the narcotics dog and its handler were not shown to be reliable. We agree that res judicata does not apply and further hold that

the trooper prolonged the stop in violation of the Fourth Amendment beyond what was necessary to address the observed traffic violations. Accordingly, without reaching the remainder of Pardee's arguments, we reverse the denial of his motion to suppress and remand for further proceedings.

## I. Facts and Procedural History.

On June 13, 2012, shortly before 9:30 a.m., Eric Vander Weil, an Iowa State Trooper, was parked on the median of Interstate 80 watching westbound traffic. He was participating in a criminal interdiction effort focused on out-of-state vehicles. Trooper Vander Weil saw a silver Toyota with California plates go past. The driver had his hand on his face and did not look at the trooper as he passed by. Trooper Vander Weil decided to follow the car.

As he approached the moving vehicle in his patrol car, Trooper Vander Weil observed the Toyota slowing down to sixty-five miles per hour, below the seventy-miles-per-hour posted speed limit. Pulling alongside the moving vehicle, Vander Weil also noticed that the driver looked over at him, then looked away and didn't look back at him again. In addition, Vander Weil saw the driver with his hands now at the ten and two positions on the steering wheel. Vander Weil slowed his own patrol car and pulled in behind the silver Toyota.

At this point, Vander Weil saw that the top portion of the right taillight on the car was not working. He also observed the Toyota following closely behind a semi. Vander Weil noted the existence of these two traffic violations and decided to pull over the Toyota.

Once the Toyota and the patrol car were both stopped on the shoulder of the highway, Trooper Vander Weil walked up to the Toyota and informed the driver of the two traffic violations. He noticed that the

Toyota still had its right turn signal on.  Trooper Vander Weil stated that he was just going to issue warnings for the violations and there would be no fine.  He asked the driver, John Saccento, to provide his license, registration, and insurance and to accompany him to the patrol car.[1]  He also asked the passenger, Robert Pardee, to provide identification.

Trooper Vander Weil felt that both Saccento and Pardee were nervous when he spoke to them.  Pardee had a "carotid artery pulsating in his neck."  Trooper Vander Weil also detected the strong odor of air freshener and saw a small can of air freshener on the floor of the car.  Additionally, he observed other items in the car, such as a bag of trash and a sleeping bag on the back seat, which led him to believe the men were "traveling hard, not taking any time to throw away their trash and make any unnecessary stops."

Saccento told Trooper Vander Weil that he was moving back to New Jersey from California.  He explained that he was making the move in multiple trips and that he was currently returning from his second trip from California to New Jersey.  Trooper Vander Weil questioned Saccento—now seated in the patrol car—why he wouldn't just rent a U-Haul to avoid the time and expense of repeated trips.  Saccento responded that it was "more fun to drive" and that he and Pardee had made stops on the way.  Trooper Vander Weil continued to question Saccento about where he planned to work in New Jersey (Saccento said Prudential Financial Services), what part of New Jersey he was moving to (Saccento said Berkeley Heights, where his family lives), who was with Saccento in the car (Saccento said "a friend"—although Trooper Vander

---

[1]Trooper Vander Weil acknowledged it was not necessary for the driver to come to his car for the warnings to be prepared, although the driver would need to sign to acknowledge receipt of the warnings after they were finished.

Weil of course had Pardee's Arizona driver's license), when he had made the prior trip (Saccento said Memorial Day weekend), how long the drive was from California to New Jersey (Saccento said about fifty hours), and whether Saccento's friend was still living in Arizona (Saccento said yes). After four minutes of questioning along these lines, Trooper Vander Weil called in a warrants check on Saccento and Pardee. Meanwhile, the questioning continued. The warrants check came back within three minutes, showing that Pardee had a warrant but not for an extraditable offense.[2]

Trooper Vander Weil continued to question Saccento seated next to him in the patrol car. He also started to complete the warnings. After Trooper Vander Weil and the driver had been in the patrol car about sixteen minutes, Vander Weil printed out the warnings and told the driver he would be "right back" after he returned Pardee's driver's license.

Trooper Vander Weil then proceeded to question Pardee. Pardee gave answers that were generally consistent with those of Saccento about the reason for their trip, Saccento's planned employment in New Jersey, the number of previous trips they had made between California and New Jersey, and how long they had known each other. Pardee was also uncertain as to when they had left California. He stated that he supposed they had left California on this trip four days ago, immediately after relating that it usually took four to five days to get from California to New Jersey. Trooper Vander Weil felt that this "contradiction" was an indication that "Pardee's timeline was messed up." Following about three

---

[2]Trooper Vander Weil also received criminal histories by email at this time that showed both Saccento and Pardee had prior charges for possession of marijuana, although Vander Weil did not remember if convictions resulted.

minutes of questioning Pardee, Trooper Vander Weil returned to his patrol car and had Saccento sign for the warnings. At 9:55 a.m., Trooper Vander Weil told Saccento he was free to go.

However, instead of leaving, Saccento asked Trooper Vander Weil, "Do you mind if I like, just hang out here for a minute and stretch my legs?" Trooper Vander Weil said this was "no problem" but he then asked Saccento if he would consent to answering more questions, which Saccento did. Trooper Vander Weil then began asking pointed questions about whether Saccento had "anything illegal in the car," "any large amounts of marijuana," "large amounts of cocaine," "large amounts of heroin," "large amounts of methamphetamine," or "large amounts of money." Saccento answered no to all of these questions.

Trooper Vander Weil next asked Saccento if it would be okay if he searched the car. Saccento responded he would prefer not to have a search because he wanted to get going. Trooper Vander Weil stated, "Well, you don't have to let me to, I mean it's up to you." Yet he then asked if he could have a dog come and sniff the vehicle. Saccento again declined the request.

Trooper Vander Weil advised Saccento, "Well if you don't want to wait for the dog, and you don't want to let me search, I'm going to detain you, and I am going to call for a dog to come sniff your car . . . . Either way I am going to run the dog." Several minutes later, the K-9 unit arrived, and the dog alerted on the vehicle.

Subsequent searches of the car revealed small amounts of marijuana in the center console, in the backseat, and in the trunk. In addition, a computer bag on the front passenger seat contained $33,100 in cash. The search also uncovered handwritten notes appearing to reflect sales of marijuana. Saccento and Pardee were arrested and

thereafter charged with possession of marijuana in violation of Iowa Code section 124.401(5) (2011). On September 4, the State also filed a forfeiture notice under Iowa Code section 809A.8 with respect to the $33,100 cash.

Pardee filed a motion to suppress in the criminal case. He challenged the initial vehicle stop. Additionally, he argued that even if the original stop was valid, law enforcement expanded and prolonged the stop and conducted the dog sniff without reasonable suspicion or probable cause. Moreover, Pardee challenged the reliability of the dog sniff and, therefore, the State's reliance on the dog's alert to justify the ensuing search of the vehicle.

Trooper Vander Weil and Trooper David Baker, the K-9 officer, both testified at the suppression hearing. A DVD of the entire stop was also introduced into evidence.

Trooper Vander Weil acknowledged that he was engaged in criminal interdiction work on June 13. His purpose was to stop vehicles bearing out-of-state license plates from the west or east (such as California) for traffic violations and use the stops as a basis to investigate possible criminal activity. Trooper Vander Weil acknowledged that he "typically [is] not stopping in-state license plates for interdiction activities." Trooper Vander Weil also admitted that if he had only focused on issuing warnings for the observed traffic violations, the entire stop would take something like ten, eleven, or twelve minutes. Here, admittedly, "the traffic stop for Mr. Pardee and Saccento was really just the avenue through which [he] could conduct a criminal interdiction investigation." Trooper Vander Weil conceded that the questions he posed to Saccento and Pardee had nothing to do with the traffic violations and were related, instead, to his interdiction investigation. He

further acknowledged that if he wasn't doing this questioning, he could have written the warning citations more quickly.

Trooper Vander Weil enumerated the factors that he believed in combination gave him reasonable suspicion to conduct the dog sniff: the California license plates, the cautious behavior of the driver as the trooper approached, some later inconsistent answers about travel plans, the lack of cost-effectiveness for the trip, the nervousness of the vehicle occupants as demonstrated in various ways, the criminal histories (or at least arrest histories) of the occupants, the lived-in look of the vehicle, and the strong odor of air freshener.

Trooper Baker testified that he was the handler for Nellie—the Belgian Malinois female narcotics dog who performed the sniff. He explained that he and Nellie had been through six weeks of K-9 camp where Nellie was trained to alert on marijuana, cocaine, methamphetamine, and heroin. Additionally, Nellie underwent roughly sixteen hours per month of maintenance training. Nellie was certified as a narcotics dog after a "typical and suitable" score on her final examination. Trooper Baker added that he had forty-one deployments with Nellie since her certification and she had done "a very good job." Nellie exhibited a "high alert level," which meant her behavior made it quite clear when she had detected a narcotics odor. Trooper Baker also testified that he is the K-9 trainer for the entire State Patrol.

Trooper Baker stated that he was called in on June 13 to perform the dog sniff on the silver Toyota. He testified that Nellie alerted immediately on the passenger compartment of the vehicle, which the DVD confirmed.

Following the evidentiary hearing, the district court denied the motion to suppress. Among other things, the court found that the

totality of the circumstances established reasonable suspicion for law enforcement to detain Saccento and Pardee for the dog sniff at the conclusion of the traffic stop, and that Trooper Baker and his dog were "well trained" and "reliable" such that Nellie's alert justified subsequent search of the vehicle.[3]

On August 29, 2013, following a stipulated bench trial on the minutes of testimony, Pardee was acquitted of marijuana possession. The district court determined the facts failed to establish beyond a reasonable doubt that Pardee possessed the marijuana found in the vehicle. The court noted the absence of evidence that the marijuana was "among or near Pardee's personal belongings," noted the marijuana was not found in plain view, and noted that Pardee did not own the vehicle.

Meanwhile, Pardee had answered the forfeiture complaint and alleged he was the owner of the $33,100 cash. Pardee also filed a motion to suppress in the forfeiture case, asserting the same grounds as in the criminal case and arguing the money had been seized in violation of his rights under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. The State responded that the motion to suppress was barred by claim preclusion based on the prior ruling in the criminal case. Pardee disputed that contention. The district court, however, agreed with the State that the motion was barred by "res judicata and claim preclusion" and overruled Pardee's motion.[4]

---

[3]The court also denied Pardee's motion to enlarge findings of fact and conclusions of law, which reasserted Pardee's contentions that the initial traffic stop was unconstitutional and that law enforcement unreasonably and unconstitutionally extended the duration of the stop.

[4]In support of the equal protection prong of his motion, Pardee offered evidence that once Trooper Vander Weil joined the interdiction team, 1902 or ninety-two percent of his citations and warnings were written to out-of-state plated vehicles. Although this evidence had not been previously presented in the criminal case, the district court

On September 17, the forfeiture proceeding went to trial. At the outset, Pardee asked the district court to reconsider its ruling on the motion to suppress. The court declined to do so.

The State then called a Nebraska State Trooper as a witness. The Nebraska trooper testified to interviewing Pardee after he had been arrested in Nebraska on January 21, 2013, approximately seven months after the Iowa stop at issue in this case. In the course of the lengthy Nebraska interview, Pardee had admitted to being involved in marijuana trafficking between Arizona and California and the east coast since 2011. Pardee said in the interview that the $33,100 had been taken from him when he was stopped by Trooper Vander Weil in June 2012, that the cash represented proceeds from the sale of marijuana in New York, and that he had falsely told the Iowa authorities at the time the cash represented proceeds from the sale of one or two pickups. DVDs of the Nebraska interview were also introduced into evidence. Additionally, Trooper Vander Weil testified, along with an Iowa Division of Narcotics Enforcement agent who interviewed Pardee in June 2012.

At the conclusion of the forfeiture trial, Pardee once again asserted his motion to suppress. The district court denied the motion for the reasons previously stated. It also found the cash seized by the State on June 13, 2012, was subject to forfeiture as proceeds of a criminal offense. *See* Iowa Code §§ 809A.3(2), .4(3).

Pardee appealed the forfeiture decree, arguing his motion to suppress should have been granted. We transferred the case to the court of appeals. In a thorough opinion, the court of appeals explained why

_____

concluded it would have been available earlier and, in any event, did not establish an equal protection violation.

neither claim preclusion nor issue preclusion justified denial of Pardee's motion to suppress. Yet it nonetheless affirmed the forfeiture, finding (1) Iowa law allows law enforcement to make pretextual stops based on traffic violations to further an investigative purpose, (2) such stops do not violate an out-of-stater's right to interstate travel, (3) Trooper Vander Weil's questioning did not impermissibly extend the duration of the traffic stop and by the conclusion of the stop he had reasonable suspicion to detain the occupants in order to perform the dog sniff, and (4) the canine unit was shown to be reliable.

We granted Pardee's application for further review.

## II. Standard of Review.

We review the district court's denial of a motion to suppress based on the deprivation of a constitutional right de novo. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). In our review, we must make "an independent evaluation of the totality of the circumstances as shown by the entire record." *Id.* (quoting *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Id.* (quoting *Palmer*, 791 N.W.2d at 844).

## III. Issue Preclusion.

The first issue we must resolve is whether the district court's denial of Pardee's motion to suppress in the criminal case has preclusive effect in this case. We agree with the court of appeals' comprehensive discussion of this issue, which concludes there is no preclusive effect. For present purposes we need to focus on issue preclusion—not claim preclusion. Whether evidence should be admitted or not is an *issue,* not a claim.

Issue preclusion does not apply here because Pardee was *acquitted* in the criminal case. Hence, the trial court's determination of the motion to suppress against Pardee was not necessary to the final judgment. *See George v. D.W. Zinser Co.,* 762 N.W.2d 865, 868 (Iowa 2009) (stating for issue preclusion to apply, "the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment"); Restatement (Second) of Judgments § 27 cmt. *h*, at 258 (Am. Law. Inst. 1982) (requiring that the prior determination be "essential to" the final judgment and noting that where the judgment is "not dependent" upon the determination, the determination does not have issue preclusive effect); *cf. Property v. State*, No. 06–11–00113–CV, 2012 WL 1940805, at *4 (Tex. Ct. App. May 22, 2012) (finding that the denial of a motion to suppress in a criminal case had collateral estoppel effect where "[t]he trial court's determination that the fruits of Cruson's search were not subject to suppression was necessary to the prior criminal [conviction]").[5]

### IV. Merits of the Suppression Motion.

On the merits, as noted above, Pardee made a number of challenges to the suppression ruling, all of which were rejected by the court of appeals. On further review, we only need to reach one of those arguments. We conclude that regardless of whether the initial vehicle stop was valid or not, Trooper Vander Weil's detention of the vehicle occupants for approximately twenty-five minutes preceding the dog sniff

---

[5]We also find that Pardee raised a sufficient challenge to the trial court's res judicata ruling for purposes of this appeal. Pardee's principal brief correctly points out that the district court's ruling must have been based on issue preclusion, not claim preclusion, but that issue preclusion does not apply here because "[t]he Suppression Ruling was not necessary nor essential to the judgment." Pardee also cites pertinent authority in support of his argument. Notably, the State does not respond to these points or attempt to defend the district court's res judicata ruling on the merits.

was improper under the Fourth Amendment to the United States Constitution. Applying recent United States Supreme Court precedent, we find that Trooper Vander Weil developed reasonable suspicion of other criminal activity—if at all—only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings. In doing so, he violated Pardee's federal constitutional rights.[6]

Our point of departure is the recent decision of the United States Supreme Court in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). That case, like this one, involved a dog sniff following a traffic stop. *Id.* at ___, 135 S. Ct. at 1612, 191 L. Ed. 2d at 496. There, a police officer had pulled over the defendant's car for a traffic violation upon observing the vehicle temporarily veer onto the shoulder of the highway. *Id.* After running a records check on both the driver and the lone passenger, and writing a warning for the driver, the officer asked for permission to walk his dog around the vehicle. *Id.* at ___, 135 S. Ct. at 1613, 191 L. Ed. 2d at 497. The driver refused, whereupon the officer detained the vehicle's occupants for another five minutes until a deputy sheriff arrived. *Id.* At that point, the officer led the dog twice around the car and the dog alerted to the presence of drugs on the second pass. *Id.* Although both the district court and the court of appeals upheld the dog sniff under the Fourth Amendment, the Supreme Court found that Rodriguez's motion to suppress should have been granted because law enforcement had unconstitutionally prolonged the traffic stop. *Id.* at ___, 135 S. Ct. at 1613–14, 1616–17, 191 L. Ed. 2d 497–98, 500–01.

---

[6]We do not need to reach Pardee's challenge to the duration of the stop based on article I, section 8 of the Iowa Constitution, or any of his other claims based on article I, section 8.

In *Rodriguez,* the total delay between issuance of the written warning and the dog alert on the vehicle was approximately seven to eight minutes. *Id.* at ___, 135 S. Ct. at 1613, 191 L. Ed. 2d at 497. The district court found that the officer did not have individualized suspicion of criminal activity prior to the dog sniff, and for purposes of appeal, the Eighth Circuit assumed this to be the case. *See id.* at ___, 135 S. Ct. 1613–14, 191 L. Ed. 2d 497–98. Yet the Eighth Circuit nonetheless upheld the dog sniff and subsequent search of the vehicle, reasoning that a "seven- or eight-minute delay" for investigative purposes was an "acceptable '*de minimis* intrusion on Rodriguez's personal liberty.' " *Id.* at ___, 135 S. Ct. at 1614, 191 L. Ed. 2d at 498 (quoting *United States v. Rodriguez,* 741 F.3d 905, 907 (8th Cir. 2014)).

In a 6–3 decision, the Supreme Court reversed. *Id.* at ___, 135 S. Ct. at 1612, 1617, 191 L. Ed. 2d at 496, 501. As the Court explained, setting forth what appears to be a bright-line rule, "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614, 191 L. Ed. 2d at 498. "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' " *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229, 238 (1983)). The officer's drug investigation added seven to eight minutes to Rodriguez's detention, rendering it unconstitutional unless the government had reasonable suspicion of criminal activity apart from the traffic violation. *Id.* at ___, 135 S. Ct. at 1613, 1616–17, 191 L. Ed. 2d at 497, 500–01.

The *Rodriguez* Court referred to and factually distinguished a prior case upholding a dog sniff that had occurred while the state trooper was in the process of writing a warning ticket. *See id.* at ___, 135 S. Ct. at

1614–15, 191 L. Ed. 2d at 498–99 (discussing *Illinois v. Caballes*, 543 U.S. 405, 406, 408, 125 S. Ct. 834, 836, 837, 160 L. Ed. 2d 842, 846, 847 (2005)). Yet it reaffirmed "the line drawn in that decision" that a traffic stop " 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.* at \_\_\_, 135 S. Ct. at 1612, 1614–15, 191 L. Ed. 2d 496, 499 (quoting *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846).[7] Thus, in *Rodriguez*, the Court confirmed that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at \_\_\_, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499.

Unrelated checks, the Court explained in *Rodriguez*, are matters that do not "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* A dog sniff, unlike matters such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance," can only be undertaken without individualized suspicion if it does not prolong the traffic stop. *Id.* at \_\_\_, 135 S. Ct. at 1615, 1616, 191 L. Ed. 2d at 499, 501. The Court added that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.,* adds time to—'the

---

[7]Likewise, the Court found support for its ruling in *Arizona v. Johnson*, 555 U.S. 323, 326, 129 S. Ct. 781, 784, 172 L. Ed. 2d 694, 700 (2009), dealing with a challenge to a stop and frisk of passengers in a vehicle. The Court upheld the frisk but cautioned: "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788, 172 L. Ed. 2d at 704.

stop.' " *Id.* at \_\_\_, 135 S. Ct. at 1616, 191 L. Ed. 2d at 501.  "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' " *Id.* at \_\_\_, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500 (quoting *Caballes*, 543 U.S. at 407, 125 S. Ct. at 837, 160 L. Ed. 2d at 846).[8]

Pardee argues that *Rodriguez* controls here and that Trooper Vander Weil violated his constitutional rights by using what should have been a quick traffic stop to conduct extensive investigative questioning and then a dog sniff while detaining the vehicle occupants for approximately twenty-five minutes.  The State responds that this case is distinguishable from *Rodriguez* because reasonable suspicion of criminal activity existed as soon as Trooper Vander Weil walked up to the Toyota and assessed the situation.  During the ensuing twenty-five minutes, in the State's view, Trooper Vander Weil's already justifiable suspicion was enhanced as he learned more about the occupants and their alleged travel plans.

The State points to the various factors cited by the district court in its order denying Pardee's motion to suppress in the criminal case: the California license plates, Saccento's behavior before Trooper Vander Weil pulled over the vehicle, the nervousness of Saccento and Pardee after Trooper Vander Weil stopped the vehicle, the lived-in look of the vehicle, the presence of a can of air freshener and the strong odor of air freshener, the criminal histories of Saccento and Pardee, and finally their curious and somewhat inconsistent travel plans.  The latter two items, of

---

[8]The Court added that the officer may "take certain negligibly burdensome precautions in order to complete his mission safely."  *Rodriguez*, 575 U.S. at \_\_\_, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500.  But again, it distinguished this officer safety interest "from the Government's endeavor to detect crime in general or drug trafficking in particular."  *Id.*

course, were developed only after the Toyota had been pulled over and Trooper Vander Weil undertook his investigation.

In weighing the parties' respective positions, comparisons to other cases are useful. We consider first, *United States v. Briasco*, 640 F.3d 857 (8th Cir. 2011), cited by the court of appeals below. There the Eighth Circuit upheld a trooper's decision to further detain a motorist for a vehicle dog sniff after writing a warning ticket for a speeding violation. *Briasco*, 640 F.3d at 860. In finding that reasonable suspicion existed, the court took note of

> the strong odor of air freshener in the car, the sagging or squatting of the back end of the vehicle, Briasco's increasing nervousness shown by the developing dryness in his mouth and visible carotid artery, Briasco's imprecise description of his travel plans, and his failure to disclose the full facts about his criminal history.

*Id.* at 859–60.

This case shares some characteristics of *Briasco* but is distinguishable in other respects. On the whole, one can fairly say the grounds for suspecting Saccento and Pardee of other criminal activity before they were detained for the dog sniff were not *that* strong. That probably explains why Trooper Vander Weil said they were free to go. More importantly, it appears the most significant ground for suspecting Saccento and Pardee of criminal activity had to be the information they provided on their travel plans *during* the vehicle stop. We are not persuaded that the knowledge Trooper Vander Weil possessed at the beginning of the stop—the California plates, the slowing down to sixty-five miles per hour, the failure to make eye contact with the trooper, the oversight of leaving the right signal light on after pulling over, the initial nervousness, the lived-in look of the vehicle, or the air freshener—provided reasonable suspicion alone or in combination. Much of the

conduct observed here would be typical of any motorist who is approached and then pulled over by state law enforcement. Many motorists slow down, decline to make eye contact, and get nervous when a state trooper draws near. *See United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004) (noting that nervousness during a traffic stop is of "limited significance").

*Briasco* can be contrasted with the Eighth Circuit's decision in *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). In that case, the Eighth Circuit considered whether seven factors gave rise to reasonable suspicion warranting a renewed detention following the issuance of a warning for a traffic violation. *Id.* at 1136, 1140. Those factors were: (1) an absent third party had rented the car driven by the defendant, (2) the car had a California license plate, (3) fast food trash was on the floor of the car, (4) there was no visible luggage in the car, (5) the defendant driver had a nervous demeanor, (6) the trip was being made "from a drug source state to a drug demand state," and (7) the officer disbelieved the driver's explanation for the trip. *Id.* at 1137. The court found those factors did not provide a basis for an ongoing detention. *Id.* at 1137–39.

The lived-in look of Saccento and Pardee's vehicle, to judge by the photographs that are in the record, was unremarkable given the occupants were clearly on a cross-country trip. There were water bottles, an energy drink, a metal coffee cup, chips and dip, apples and bananas, a trash bag with some trash, a sleeping bag draped on the rear seat, and a guitar case. Many vehicles are more lived-in than that. The video recordings of the stop also tend to dispel any impression that the occupants were unusually apprehensive (until the narcotics sniffing dog was called in around 10 a.m.). While the strong odor of air freshener was

certainly a relevant consideration, alone it would not support detention of the occupants beyond the time required for the traffic stop. *See Frazier v. State*, 236 P.3d 295, 301 (Wyo. 2010) ("The presence of odor suppressing agents, alone, does not give rise to reasonable suspicion, but can be a factor contributing to the totality of the circumstances."); *cf. Commonwealth v. Kemp*, 961 A.2d 1247, 1254 (Pa. Super. Ct. 2008) (finding reasonable suspicion when scent of air fresheners was "overpowering," trooper still detected the odor of marijuana, driver acted extremely nervous, and vehicle belonged to absent third party). In short, we cannot find that Trooper Vander Weil had developed individualized suspicion of criminal activity at the outset of the stop when he first encountered Saccento and Pardee in person.

If we conclude, as we must, that reasonable suspicion could potentially exist only if one weaves in the verbal answers given by Saccento and Pardee regarding their travel plans and their respective criminal histories, we then need to decide whether that information was obtained only because Trooper Vander Weil prolonged the stop beyond what was reasonably necessary to carry out his traffic-related mission. *See Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616, 191 L. Ed. 2d at 500. In *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015), the Ninth Circuit performed this kind of post-*Rodriguez* inquiry. In that case, a sheriff's deputy had pulled over a car at 7:09 p.m. for traffic violations on Interstate 80 with the plan of furthering a drug investigation. *Evans*, 786 F.3d at 781–82. At 7:28 p.m., nineteen minutes later, the deputy gave the driver a warning and told him he was "good to go." *Id.* at 783. However, the deputy then asked the driver if he had any contraband in the car, mentioning marijuana, cocaine, methamphetamine, and heroin. *Id.* When the driver denied the presence of contraband but refused to

consent to a search, the deputy performed a dog sniff. *Id.* at 783–84. The canine alerted at 7:33 p.m., twenty-four minutes after the stop began. *Id.* at 784.

The Ninth Circuit concluded that the deputy had prolonged the stop beyond what was reasonably necessary to perform his traffic-related mission, specifically noting that the deputy had called in an ex-felon registration check at 7:20 p.m., that the check took eight minutes, that the check was not related to the traffic grounds for the stop, and that the deputy used the time to question the defendant and see if there were inconsistencies in his story. *Id.* at 786–87. The Ninth Circuit therefore found that the stop was invalid under *Rodriguez* unless the deputy's "prolongation of the traffic stop was supported by independent reasonable suspicion."[9] *Id.* at 789.

Similarly, in *People v. Pulling*, the Illinois Appellate Court applied *Rodriguez* to uphold the granting of a motion to suppress after finding that a trooper "unlawfully prolonged the duration of the stop when he interrupted his traffic citation preparation to conduct a free-air sniff based on an unparticularized suspicion of criminal activity." 34 N.E.3d 1198, 1201 (Ill. App. Ct. 2015). There, the trooper initiated a traffic stop for speeding. *Id.* at 1199. According to the trooper, writing a speeding ticket generally only took between three or five minutes, although the required time would have been longer because it turned out the driver had a suspended license. *Id.* The trooper admitted that about four minutes into the stop, he had all the information necessary to prepare both citations. *Id.* at 1201. Yet he stopped writing the citations, and

---

[9]On remand, the district court found that individualized suspicion did not exist to justify the deputy's prolongation of the stop beyond 7:20 p.m. *See United States v. Evans*, ___ F. Supp. ___, ___, 2015 WL 4711148, at *2, *9–10 (D. Nev. August 7, 2015).

instead conducted further questioning, which detected inconsistencies, before performing a free-air sniff. *Id.* Even though the entire stop consumed only fifteen minutes, the court found the unrelated activity had prolonged it, and the results of the dog sniff therefore had to be suppressed. *Id.* at 1202.

And even in a pre-*Rodriguez* case, the Eighth Circuit concluded that a trooper unlawfully extended a traffic stop when the "off-topic questions more than doubled the time Peralez was detained." *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008). There approximately sixteen minutes elapsed between the initial pullover of the vehicle and the dog sniff. *Id.* at 1119. Three minutes into the stop, the trooper had told the driver he would receive a warning ticket for the obstructed license plate. *Id.* But during the next thirteen minutes, the trooper engaged in "a 'blended process,' interspersing drug interdiction questions with the routine processing of a traffic stop." *Id.* at 1119–20. The trooper admitted that the "blending" prolonged the stop. *Id.* at 1120.

This case involves a similar blending. At 9:33 a.m., Trooper Vander Weil had all the information he needed to prepare warnings and had told the vehicle occupants he was only going to issue warnings. By Vander Weil's admission, he could have gone back to his patrol car at that point and completed his traffic-related mission without Saccento's or Pardee's involvement except for a signature on the warning citations. Instead, he asked Saccento to come with him. He then questioned Saccento for five minutes in his car before calling in the information for a warrants check and a criminal background check at 9:38 a.m.[10] The

---

[10]Trooper Vander Weil admitted the criminal history check had nothing to do with processing the traffic violations and was part of his interdiction investigation.

response to the warrants check came back at 9:42 a.m. From 9:43 to 9:44 a.m., it appeared that Trooper Vander Weil was in the process of preparing the warnings because he asked Saccento to confirm the year of the Toyota. At 9:50 a.m., the warnings were complete and printed out. At this point, Trooper Vander Weil left Saccento in the vehicle, approached Pardee, and conducted separate investigative questioning of him for three minutes. Then, at 9:55 a.m., twenty-five minutes after pulling the vehicle over, the trooper returned to the vehicle and told Saccento he was free to go. Given all this, and Trooper Vander Weil's admission that the entire stop would have taken only about ten to twelve minutes if he had been focused on issuing the warnings, the stop was clearly prolonged within the meaning of *Rodriguez*. *See* 575 U.S. at ___, 135 S. Ct. at 1612–13, 191 L. Ed. 2d at 496–97 (holding that a traffic stop prolonged approximately seven to eight minutes beyond the time reasonably required to complete the mission of the stop was unlawful). In fact, based on our review of the videos, we think the ten-to-twelve-minute estimate overstates the amount of time a simple traffic stop would have required.[11]

We must then ask whether individualized suspicion to justify a dog sniff would have existed without this delay. *See id.* at ___, 135 S. Ct. at 1616–17, 191 L. Ed. 2d at 501 (remanding for consideration of whether reasonable suspicion supported detaining defendant beyond time required to complete traffic stop). We find that it would not have existed. As we have already noted, the information Trooper Vander Weil had at the outset of the stop did not support more than a detention to process

---

[11]In the course of cross-examination, Trooper Vander Weil also admitted testifying in a prior case that it takes about five minutes to fill out a warning.

the traffic violations. And in his early questioning, all that Trooper Vander Weil had been told was that Saccento with the help of his companion was moving home from California to New Jersey in multiple trips. No inconsistencies—even minor ones—had been developed in the occupants' story. While Saccento's stated plan to move home from California to New Jersey in multiple trips may not have been "cost-effective," as Trooper Vander Weil later testified, we cannot say this factor, even when added into the considerations the trooper was aware of when he made the stop, amounted to reasonable suspicion of drug trafficking. *See Beck*, 140 F.3d at 1139 (holding that an officer's disbelief of a driver's explanation for traveling even when coupled with other factors was not enough to give rise to reasonable suspicion).

The State urges that Saccento's and Pardee's criminal histories—which apparently disclosed that each had at least a prior drug-related arrest—also enter into the reasonable suspicion calculus. It is not clear when Trooper Vander Weil received these histories via email but we find it would not have been earlier than 9:44 a.m. That is when dispatch, having provided the answer to the warrants check at 9:42 a.m., was asking the trooper whether Saccento and Pardee were both white. This occurred over ten minutes into the stop.

On our independent review of the record, we are convinced that a stop in this case directed only at the traffic-related mission—i.e., checking driver's license, vehicle registration, insurance, and outstanding warrants, and preparing warnings—would have taken no more than ten minutes. At that point, i.e., at approximately 9:41 a.m., Trooper Vander Weil did not have Saccento's and Pardee's criminal histories partly because he did not even try to obtain this information until 9:38 a.m., *after* he had already been questioning Saccento for five

minutes in his patrol car. Thus, even if the criminal histories might have tipped the balance on reasonable suspicion, an issue we are not deciding, they were not obtained until the stop had already been prolonged past its permissible length in violation of *Rodriguez* and the Fourth Amendment.

### V. Conclusion.

For the foregoing reasons, we reverse the denial of Pardee's motion to suppress and remand for further proceedings in accordance with this opinion.

**DECISION OF THE COURT OF APPEALS VACATED, DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Wiggins, J., who concurs specially, and Cady, C.J., and Zager, J., who dissent.

#14–0029, *In re Property Seized from Pardee*

**WIGGINS, Justice (concurring specially).**

I concur with the majority that the stop violates the Fourth Amendment to the United States Constitution. However, I would go further and find a pretextual stop violates article I, section 8 of the Iowa Constitution.

**CADY**, **Chief Justice (dissenting).**

I respectfully dissent. The holding in *Rodriguez v. United States* resolved a division among lower courts on the question of whether police may routinely extend an otherwise completed traffic stop absent reasonable suspicion in order to conduct a dog-sniff search. 575 U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). The answer is clearly no. However, the issue the Supreme Court did not reach in *Rodriguez* was whether reasonable suspicion of criminal activity unrelated to the purpose of the traffic stop justified the detention of the defendant beyond the time needed to complete the traffic stop. *Id.* at ___, 135 S. Ct. at 1616–17, 191 L. Ed. 2d at 501. After a careful review of the record, I would conclude the officer acquired reasonable suspicion of criminal activity unrelated to the purpose of the traffic stop. Therefore, the officer was permitted to extend the detention of the defendant beyond the time needed to process the traffic citations to confirm his suspicions.

I agree an officer cannot normally pursue unrelated inquiries during a traffic stop except those normally incidental to the stop. However, a traffic stop can be reasonably extended to check out reasonable suspicion of unrelated criminal activity. *See State v. Aderholdt*, 545 N.W.2d 559, 564 (Iowa 1996) (holding suspicious responses and actions permitted the officer's inquiry to be broadened, and defendants' detention while a drug dog and tow truck were summoned did not exceed the reasonable scope of the stop). Here, three factors were present to provide reasonable suspicion to extend the stop. First, the officer observed overt physical signs of nervousness of the occupants of the vehicle. Second, the interior of the vehicle smelled strongly of a specific air freshener known by the trooper to be frequently

used to mask the scent of marijuana.[12] A can of this air freshener was visible through the window of the vehicle.[13] Finally, the condition of the interior of the vehicle indicated the occupants were traveling hard.

These three pieces of information combined to give the officer reasonable suspicion that drugs could be located in the vehicle. This reasonable suspicion entitled the officer to extend the time to complete the stop. It entitled the officer to ask questions specifically related to the suspicion of drug activity in conjunction with questions related to the traffic stop. The inconsistent answers to the additional questions generated even greater suspicion of unrelated criminal activity and ultimately justified the request for a drug dog. Furthermore, the additional time for the drug dog to arrive did not unreasonably extend the time of the stop. The dog arrived at the scene of the stop within five minutes from the time the request was made.

---

[12]We have long established that the odor of marijuana alone can give an officer probable cause to search the vehicle. *State v. Eubanks*, 355 N.W.2d 57, 59 (Iowa 1984); *see State v. Watts*, 801 N.W.2d 845, 854 (Iowa 2011) ("[A] trained officer's detection of a sufficiently distinctive odor, by itself or when accompanied by other facts, may establish probable cause."); *State v. Moriarty*, 566 N.W.2d 866, 869 (Iowa 1997) (combining the scent of burnt marijuana with the presence of an unused alligator clip and the officer's experience to create probable cause); *State v. Predka*, 555 N.W.2d 202, 207 (Iowa 1996) (finding the odor of marijuana, the driver's nervous state, and officer's observation of a screen and small plastic bags provided probable cause to search the vehicle); *State v. Merrill*, 538 N.W.2d 300, 301–02 (Iowa 1995) (finding sufficient grounds to search the passenger of a vehicle based on the smell of burnt marijuana and the passenger's furtive movements).

[13]The combination of the presence of the can of air freshener on the front floorboard and the strong odor of that air freshener coming out the window of the vehicle could imply that the air freshener was sprayed from the can as a response to the flashing lights signaling the trooper's request that the vehicle pull over. This is not a case of an air freshener hanging from the rearview mirror, but instead implicates a deliberate action taken by those in the vehicle to cover up a particular odor. While not sufficient to establish probable cause to search on its own, it is distinct enough behavior that it could allow an experienced officer to form a reasonable suspicion when combined with the other suspicious behaviors.

The time necessary for an officer to process a traffic stop does not require a stopwatch. The officer is entitled to detain a driver long enough to issue the citation or warning and to check out the ordinary incidental aspects of a traffic stop, such as a drivers' license check, outstanding-warrant check, and proof of insurance and registration. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614–15, 191 L. Ed. 2d at 498–99. If, in the process of these activities, reasonable suspicion of unrelated criminal activity is observed, the detention is extended a reasonable time to check out the suspicion. *See State v. Bergmann*, 633 N.W.2d 328, 335–38 (Iowa 2001) ("When the purpose for the initial stop has concluded, in order to expand the scope further, reasonable suspicion of criminal wrongdoing must be present."); *see also Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615, 191 L. Ed. 2d at 499 (prohibiting stop extension only "absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). This is what occurred in this case, and the rights under the Search and Seizure Clause were not violated.

Finally, reasonable suspicion clearly existed in this case to support extending the stop. The standard of reasonable suspicion was not intended to handcuff police officers in the investigation of criminal activity. Furthermore, our constitution does not expect police to check their commonsense and good judgment at the door in deciding to pursue a criminal investigation. This case, however, holds otherwise. The result is illogical. An odor known to be marijuana emanating from a vehicle provides probable cause to search under our law, *State v. Eubanks*, 355 N.W.2d 57, 59 (Iowa 1984), but the strong odor of an air freshener known by the officer to be an agent used to mask the odor of marijuana does not even provide reasonable suspicion to investigate. Regrettably, the majority fails to identify what more the officer in this case, and

officers in the future, would need to acquire the reasonable suspicion necessary to pursue further investigation.

Zager, J., joins this dissent.