**IN THE COURT OF APPEALS OF IOWA**

No. 16-2029
Filed November 8, 2017

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT CHARLES STERN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Michael J. Shubatt, Judge.

The defendant appeals from his conviction for first-degree murder. **AFFIRMED.**

Mark C. Smith, Appellate Defender, and Maria L. Ruhtenberg, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Jean C. Pettinger, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

Robert Stern appeals from his conviction for first-degree murder, pursuant to Iowa Code section 707.2(1)(a) (2015). Stern maintains the district court erred when it denied his motion to suppress his confession after finding the waiver of his rights was knowingly, voluntarily, and intelligently given. He also argues the court erred when it refused to give the requested jury instruction for voluntary manslaughter.

**I. Background Facts and Proceedings.**

On July 9, 2015, police officers responded to a 911 call made by Stern. After arriving at his home, officers found Stern seated in a recliner in the living room and Stern's daughter in a back bedroom; she was recently deceased from gunshot wounds. When asked if he would be willing to go to the police station to be interviewed, Stern agreed to go. Officers helped him stand and locate shoes, and he walked under his own power to the officers' vehicle and got in the backseat. Stern asked if he could lie down during the ride and then proceeded to do so. Officer Kate Avenarius was making small talk with Stern during the drive when she noticed that he had stopped responding and his eyelids were flickering while closed. Officer Kurt Horch, who was driving the vehicle, then took Stern to the hospital rather than to the police department.

Dr. Anna Lorence and a nurse, Katie Harris, met the police vehicle in the ambulance bay. When asked questions by Dr. Lorence, Stern did not respond verbally, but he was able to follow her commands to step out of the vehicle, stand, pivot, and sit down in a waiting wheelchair. Stern's eyes remained closed, and when Dr. Lorence asked him to open them, he did not do so. She attempted

to manually open Stern's eyes, and he squeezed them shut so she could not. She testified that was not a medical response but rather that "it seemed like he didn't want his eyes open." The doctor concluded there was not an immediate emergent threat to Stern's life or health; he was taken into the emergency room and the hospital began running standard tests. Results from a drug test showed Stern had some opiates in his system, which the doctor testified was consistent with the pain medication Stern had been previously prescribed for some chronic health issues.

While he was in the emergency room, medical personnel asked Stern a number of questions, such as his name and medical history, and he repeatedly responded, "I don't know." When lab technicians came to draw blood, they needed him to confirm his name and birthdate in order to take the blood; Stern stated he did not know a few times before ultimately providing the correct answer. When testifying at the suppression hearing, Nurse Harris noted Stern had reported he did not know his name, but both the officers and medical personnel had been using it with him and in front of him the entire time he was at the hospital, and he had been responding appropriately. Harris testified "there was [no] medical reason for him to behave that way that [she] could observe" and opined Stern may have been faking. She also testified that his vital signs were normal while he was in the emergency room other than his heart rate, which was a little faster than normal.

While Stern was at the hospital awaiting results on various tests, Officers Avenarius and Horch began speaking with Stern. About forty-five minutes into the interview, Stern stated he "did something very bad." Officer Horch then

advised Stern of his *Miranda* rights;[1] Stern stated he understood his rights and he "didn't have anything to hide." He then told the officers his daughter made him so mad and she "pushed his buttons and he lost it." He also stated that he shot her and then got another gun and maybe a third gun and shot her again. At some point later, when Officer Horch asked Stern questions about how his wife had died, Stern ended the conversation.

Stern was charged with murder in the first degree. He entered a plea of not guilty and filed a motion to suppress the statements he made to the police officers at the hospital, arguing his waiver of his rights was not knowingly, intelligently, and voluntarily given.[2]

At the hearing on the motion to suppress Officer Avernarius testified she and Officer Horch were with Stern for approximately three or four hours in the hospital talking (after the medical personnel had finished their evaluation of Stern) and Stern answered questions appropriately throughout that time and did not appear to have difficulty understanding the questions. The officers testified Stern was in custody but denied he was ever handcuffed or physically coerced. Officer Horch testified he advised Stern of his *Miranda* rights and Stern "told me he understood, he wanted to talk to me, he wanted to help us out. He knew what his rights were. He made that clear." Officer Horch also testified that Stern became more coherent the longer they were at the hospital but noted there was one time while they were interviewing Stern that he appeared to be confused;

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).
[2] At the hearing on the motion to suppress, Stern also asked the court to determine whether *Miranda* was actually read to Stern. The court found that it was, and Stern has not challenged that ruling on appeal.

when Horch asked Stern how many kids he had, Stern named four names but later in the interview he reported those four people were his siblings.

Following the hearing, the court denied Stern's motion, ruling:

> Horch and Avenarius both testified credibly that Defendant became cooperative approximately 30 minutes into the interview and made substantive admissions after he had been advised of his *Miranda* rights. He understood the questions that were being asked of him and responded to them rationally and appropriately. There is no evidence that Defendant was threatened or coerced, nor was there any evidence that he was promised anything in exchange for his cooperation. Nurse Katie Harris was in the room when Defendant admitted to shooting his daughter and testified that at that time Defendant did not appear to be in any physical, mental or emotional distress.
>
> The defense's theory seems to be that since Defendant presented as having some kind of episode that required police to bring him to the hospital, he lacked the requisite faculties to knowingly, intelligently and voluntarily waive his rights. The problem with this theory is that there is no evidence in the record that Defendant was having any true physical issue. Even assuming, for the sake of argument, that he had a genuine mental episode on the way to the hospital, there is no evidence that the episode persisted or ever reached the point where it warranted psychiatric evaluation or treatment.
>
> The Court makes no finding as to whether the symptoms exhibited by Defendant on his arrival to the hospital were genuine, because in the end analysis it does not matter. Defendant's faculties were intact by the time he was advised of his rights and chose to answer Horch's questions. Accordingly, the State has met its burden as to this issue.

The matter proceeded to a jury trial in September 2016 and lasted for several days. Before the matter was submitted to the jury, Stern asked the court to include the jury instruction for voluntary manslaughter, arguing the State's evidence—using Stern's own statements against him—that his daughter "had the ability to push his buttons" met the standard for a sudden, violent, or irresistible passion. The court denied Stern's request for the instruction.

The jury convicted Stern of first-degree murder with premeditation and malice aforethought.

He appeals.

## II. Discussion.

### A. Motion to Suppress.

Stern filed a motion to suppress his confession to police officers; he claims his waiver of his *Miranda* rights was not made knowingly, voluntarily, and intelligently. We review the district court's denial of a motion to suppress de novo. *In re Pardee*, 872 N.W.2d 384, 390 (Iowa 2015). We make "an independent evaluation of the totality of the circumstances as shown by the entire record." *Id.* (citation omitted). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Id.* (citation omitted).

"Once the issue of the validity of an alleged waiver of constitutional rights is raised, the State must prove by a preponderance of the evidence that the waiver was knowingly, intelligently, and voluntarily given." *State v. Countryman*, 572 N.W.2d 553, 559 (Iowa 1997). Here, Stern claims the waiver of his rights was not valid "because of his physical and emotional condition at the time." Stern focuses on the fact that officers took him to the hospital as the basis that his condition had deteriorated to the point where he could not make a knowing and voluntary waiver.

But as the district court noted, even if Stern had a legitimate medical incident that resulted in the officers bringing Stern to the hospital, there is no evidence such a condition existed at the time he waived his rights and

confessed. The medical personnel had been allowed full access to Stern and had already completed the medical steps they believed were necessary. The nurse testified that Stern's vitals were normal though his heart rate was slightly raised. Officer Horch indicated one time when he thought Stern may have been confused—when Stern provided the officers four names of his children but later indicated those people were his siblings. According to the testimony of Officers Avernarius and Horch, Stern was otherwise coherent and tracking their questions.

Additionally, in determining whether Stern's statements were voluntary, we consider whether his "will is not overborn or his capacity for self-determination not critically impaired." *State v. Madsen*, 813 N.W.2d 714, 722 (Iowa 2012). Both officers testified—credibly, according to the district court—that Stern was not handcuffed at the time of the questioning. There were no threats or use of coercion to get him to speak to the officers. In fact, when the officers asked a question he did not like about how his wife had died, Stern was the one who ended the interview.

The State has proven by a preponderance of the evidence that Stern's waiver of his rights following *Miranda* was knowing, voluntary, and intelligent.

**B. Jury Instruction.**

Stern maintains the district court erred when it did not grant his request to have the jury instructed on voluntary manslaughter. "Lesser offenses must be submitted to the jury as included within the charged offense but only if they meet both the appropriate legal and factual tests." *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013) (citation omitted). Because Iowa courts are required to

give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions, we review the district court's denial of Stern's request for correction of errors at law. *See Alcala v. Marriott Int'l., Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

Here, there was no dispute that voluntary manslaughter meets the legal test. *See Thompson*, 836 N.W.2d at 477. Rather, the court determined there was not "a factual basis in the record for submitting the included offense to the jury." *Id.* (citation omitted). Pursuant to Iowa Code section 707.4:

> A person commits voluntary manslaughter when that person causes the death of another person, under circumstances which would otherwise by murder, if the person causing the death acts solely as the result of *sudden, violent, and irresistible passion* resulting from *serious provocation* sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill.

(Emphasis added.)

Before the district court can give the instruction to the jury, the evidence presented at trial must meet both an objective and subjective standard. *Thompson*, 836 N.W.2d at 477. Subjectively, the defendant must act solely as a result of the sudden, violent, and irresistible passion. *Id.* To meet the objective standard, (1) the passion must result from a serious provocation sufficient to excite such passion in a reasonable person and (2) there cannot be an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill. *Id.* "Additionally, words alone, historically, have been insufficient to provide a factual basis for serious provocation." *Id.* at 478. In *Thompson*, our supreme court

agreed with the district court that the decedent's "actions in slapping [the defendant] and insulting him with obscene gestures fell short of the objectively serious provocation required to submit a voluntary manslaughter instruction." 838 N.W.2d at 478.

When asking the court to give the requested instruction, Stern relied on testimony from Officers Avernarius and Horch, who each testified about Stern's confession. Officer Avernarius testified, "Mr. Stern said that he got mad, was really upset and lost it, so he took the gun and shot [his daughter] multiple times." Reading from her notes, she also testified he stated, "I was very mad and I shot and killed my daughter." When Officer Avernarius was asked what made Stern mad, she testified, "He said [his daughter] maybe said something when he was sick and went crazy. From what I recall, she pushed his buttons and that's—and he lost it and that's why he shot her." Officer Horch testified that after Stern confessed to shooting his daughter, Horch asked him why he had done it, and "he proceeded to say, you know, that she knew how to push his buttons and that she made him really mad." Officer Horch clarified, "But it wasn't anything recent. It was when he was sick that she made him mad."

Based on the officers' testimony, the daughter used words to "push [Stern's] buttons," which is not sufficient to find serious provocation. Moreover, according to Officer Horch, the daughter's statements to Stern happened substantially prior in time to the shooting and Stern did not experience a "sudden passion." Even if Stern was able to meet the subjective portion of the test, he cannot establish the objective, reasonable-person portion. The district court did not err in denying Stern's request to instruct the jury on voluntary manslaughter.

**III. Conclusion.**

Stern's waiver of his *Miranda* rights was knowingly, voluntarily, and intelligently given, and the district court properly denied his motion to suppress his confession to the police officers. Additionally, there was not a factual basis in the record for submitting the voluntary manslaughter instruction to the jury. We affirm Stern's conviction for first-degree murder.

**AFFIRMED.**