**IN THE COURT OF APPEALS OF IOWA**

No. 15-2040
Filed August 2, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ERIKA ORQUIDA LOPEZ-CARDENAS,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, Jeffrey L. Larson (motion to suppress) and James S. Heckerman (trial), Judges.

Erika Lopez-Cardenas appeals from her deferred judgment for possession of marijuana with intent to manufacture and her conviction of child endangerment. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**VAITHESWARAN, Presiding Judge.**

A trooper stopped and detained a van for close to an hour until a drug dog arrived and alerted on the trunk. Following a search of the vehicle, which uncovered marijuana seeds, Erika Lopez-Cardenas was charged with and found guilty of possession of a controlled substance (marijuana) with intent to manufacture and child endangerment. She contends the district court should have suppressed the marijuana evidence on the ground that the trooper unduly prolonged the stop. She also contends her trial attorney was ineffective in two respects relating to the child endangerment charge.

## I.  *Background Facts and Proceedings*

At approximately 7:25 p.m., an Iowa State trooper was patrolling Interstate 80 when he saw a van with California plates, "dark windows," and what appeared to be "a heavy weight in the rear." The van exited onto an adjacent highway. Within two minutes, the trooper stopped the vehicle, approached the passenger side, and asked the driver for his license, registration, and insurance. Within the first thirty seconds of the stop, he confirmed the tint violation.[1]

Lopez-Cardenas was seated in the middle of the second-row of seating. A girl was seated in the front passenger seat. Lopez-Cardenas cooperated with the trooper's request for vehicle registration and insurance information. After the driver provided the trooper with an expired Michigan license, the trooper asked the driver to accompany him to the police vehicle. At this point, the trooper had already decided to issue a citation for the tinted windows.

---

[1] Both Iowa and California have minimum light transmittance requirements. *See* Cal. Veh. Code § 26708(d)(1)-(2) (2014); Iowa Code § 321.438 (2014); Iowa Admin. Code r. 761-450.7.

The trooper inquired about the driver's destination and why he had stopped, to which the driver responded he lived and worked in Chicago, he was traveling from California to Chicago following a visit with his sister, and he stopped because he was out of gas. The trooper asked the driver about his relationship with Lopez-Cardenas; he responded they were friends. The trooper also questioned the driver about the girl in the front seat. Due to a language barrier, the driver did not immediately grasp the question. He eventually mentioned her name and said she was not his daughter. The trooper returned to the van to speak to Lopez-Cardenas. He was seven minutes into the stop.

The trooper advised Lopez-Cardenas of the tint problem. She mentioned they were stopped in Utah for the same violation. The trooper questioned her along the same lines as he had questioned the driver. She provided virtually identical responses. He asked her about the girl in the front seat. She said the girl was on vacation from school and had to be back by Monday. He also asked about what he perceived to be four cell phones in the vehicle; Lopez-Cardenas stated she only had one cell phone and the rest belonged to the driver. The trooper checked the gas gauge and determined the van was indeed low on gas.

At this point, the trooper asked Lopez-Cardenas why the van was sitting so low and whether anything was being carried in the rear; she said the driver's belongings were in the back. Eleven minutes into the stop, the trooper asked Lopez-Cardenas to open the back hatch of the van; she consented. The trooper glanced in the back. At the suppression hearing, he testified to observing "several containers of fertilizer in various weights and sizes."

Within a minute, the trooper returned to his vehicle and "made a phone call to the Pottawattamie County canine officer to ask him about hidden compartments in that type of vehicle [and] to see if he was available to assist." He told the canine officer about "personal items and one bag" in the back, making no mention of the fertilizer or the girl. When the call ended, the trooper also asked the Omaha Police Department to dispatch a dog to the scene. The trooper was fifteen minutes into the stop.

While waiting for license checks on the driver, the trooper continued to question the driver in the police vehicle. Twenty minutes into the stop, the trooper received information about the expired Michigan license. He checked on Lopez-Cardenas' license and, a minute later, received a response that it was valid. The trooper inquired with law enforcement about the status of the Omaha drug dog. Twenty-six minutes into the stop, he was advised the dog was busy and he would be notified of the estimated time of arrival.

After spending a few minutes in his vehicle, the trooper returned to the van and re-confirmed the tint violation with Lopez-Cardenas—the same violation he told her about seven minutes into the stop. He again questioned Lopez-Cardenas about their travel plans and again asked about the child, who Lopez-Cardenas said was her niece. The trooper advised Lopez-Cardenas he would be giving her a ticket for letting the driver operate the vehicle with an expired license. Next he stated "and then we will get you out of here." He returned to his vehicle at 7:57 p.m., thirty minutes into the stop.

Ten minutes later, the trooper received word that the Omaha dog would be there "shortly." Two minutes after the call, he provided the driver—who was

still in the police vehicle—with two citations and a warning and repair card. He then had Lopez-Cardenas come to his vehicle, repeated the violations to her, discussed the penalty, and continued questioning her, treading much of the same ground he had covered earlier. He again asked about the child and was told she was her sister's daughter, who also lived in California.

The dog arrived at 8:16 p.m., forty-nine minutes into the stop. The trooper briefed the canine officer, again making no mention of the fertilizer or the child. He asked the officer to have the dog sniff the vehicle while he finished his paperwork. He had Lopez-Cardenas sign the citation and printed a copy for her.

The dog alerted on the van. Lopez-Cardenas consented to a search of the van, which uncovered nothing illegal. A later search at a law enforcement post uncovered three socks containing marijuana seeds.

The State charged Lopez-Cardenas with (1) possession of a controlled substance with intent to manufacture and (2) child endangerment. Lopez-Cardenas moved to suppress the evidence on the ground that the trooper unlawfully prolonged the stop without reasonable suspicion. The district court denied the motion following an evidentiary hearing. Lopez-Cardenas moved to reconsider the ruling based on a recent United States Supreme Court opinion. The district court denied the motion.

A jury found Lopez-Cardenas guilty of both crimes. Lopez-Cardenas filed a notice of appeal and sought discretionary review of the deferred judgment entered on the drug conviction. The Iowa Supreme Court granted the application and transferred the case to this court for disposition.

## II. Prolonged Detention of Vehicle

"The Fourth Amendment to the United States Constitution," as applied to the states by the Fourteenth Amendment, "and article I, section 8 of the Iowa Constitution protect individuals against unreasonable searches and seizures." *State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001). "A traffic stop is unquestionably a seizure under the Fourth Amendment." *State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013); *accord Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984).

Lopez-Cardenas does not challenge the initial stop of the vehicle for the tint violation. *See, e.g.*, *United States v. Pena-Ponce*, 588 F.3d 579, 583 (8th Cir. 2009) (concluding a window tint violation provided probable cause to stop a vehicle); *State v. Aderholdt*, 545 N.W.2d 559, 563 (Iowa 1996) (same). She focuses on the length of the subsequent detention. In her view, "the trooper's detention of the motorists for approximately fifty minutes preceding the dog sniff of [her] vehicle was improper under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution." Lopez-Cardenas has several recent opinions on her side.

In *Rodriguez v. United States*, the United States Supreme Court held "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 135 S. Ct. 1609, 1612 (2015). The Court explained, "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* at 1614 (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). The Court continued, "Authority for the

seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "Beyond determining whether to issue a traffic ticket," the Court said, typical "inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615. The Court distinguished these sorts of inquiries from dog sniffs, which lack "the same close connection to roadway safety as the ordinary inquiries" and are more appropriately characterized as measures "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (alteration in original) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)). In short, the Court stated, "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 1616.

The Court acknowledged, however, that "the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention." *Id.* at 1614. The court stated, "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop" but "he [or she] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. The Court emphasized, "The reasonableness of the seizure . . . depends on what the police in fact do." *Id.* at 1616. "The critical question," the Court said, "is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id.*

The Iowa Supreme Court echoed these sentiments in *In re Property Seized from Pardee*, a case involving "the constitutionality of a narcotics dog sniff

that occurred after the completion of about a twenty-five minute traffic stop on Interstate 80." 872 N.W.2d 384, 385-86 (Iowa 2015). There, a trooper pulled over a vehicle after observing a nonfunctioning portion of the right taillight and seeing the vehicle follow a semi too closely. *Id*. at 386. The trooper stated he would just issue warnings. *Id*. He questioned the driver and passenger about unrelated topics, eventually issued the warnings, and told them they were free to go. *Id*. at 387-88. The driver did not leave and the trooper continued the questioning and asked for consent to search the vehicle, which was denied. *Id*. at 388. The trooper called a drug dog and the dog alerted on the vehicle. *Id*.

After discussing *Rodriquez*, the court held the trooper "clearly prolonged" the stop "within the meaning of *Rodriquez*." *Id*. at 396. The court provided the following reasoning:

> On the whole, one can fairly say the grounds for suspecting [the driver and passenger] of other criminal activity before they were detained for the dog sniff were not *that* strong. That probably explains why [the trooper] said they were free to go. More importantly, it appears the most significant ground for suspecting [the two occupants] of criminal activity had to be the information they provided on their travel plans *during* the vehicle stop. We are not persuaded that the knowledge [the trooper] possessed at the beginning of the stop—the California plates, the slowing down to sixty-five miles per hour, the failure to make eye contact with the trooper, the oversight of leaving the right signal light on after pulling over, the initial nervousness, the lived-in look of the vehicle, or the air freshener—provided reasonable suspicion alone or in combination. Much of the conduct observed here would be typical of any motorist who is approached and then pulled over by state law enforcement. Many motorists slow down, decline to make eye contact, and get nervous when a state trooper draws near.

*Id*. at 394. The court proceeded to determine "whether individualized suspicion to justify a dog sniff would have existed without this delay." *Id*. at 396. The court

found none and reversed the district court's denial of the defendant's motion to suppress. *Id.* at 396-97.

The Iowa Supreme Court recently reaffirmed the principles outlined above in *State v. Coleman*, where it considered "whether a law enforcement officer, after making a valid traffic stop supported by reasonable suspicion that an offense may be being committed, must terminate the stop when the underlying reason for the stop is no longer present." 890 N.W.2d 284, 285 (Iowa 2017). After canvassing nationwide precedent, the court held, "[W]hen the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion, article I, section 8 of the Iowa Constitution requires that the driver must be allowed to go his or her way without further ado." *Id.* at 301.

With this precedent in mind, we return to the facts here. It is undisputed that the trooper confirmed the tint violation within the first thirty seconds of the stop yet detained the vehicle for an additional forty-nine minutes. While the trooper conducted out-of-state license checks during part of this time, the checks were completed in just under six minutes. Meanwhile, the trooper requested a drug dog, learned the drug dog would be delayed, and waited to give Lopez-Cardenas a citation until after the drug-dog arrived. On our de novo review, we conclude the trooper prolonged the stop well beyond the time it took to resolve the tint violation. *See Rodriguez*, 135 S. Ct. at 1612; *Coleman*, 890 N.W.2d at 301; *Pardee*, 872 N.W.2d at 394-96.

In reaching this conclusion, we have considered the precept that "[a]n officer 'may conduct certain unrelated checks during an otherwise lawful traffic stop'" as long as the checks do not prolong the stop. *Pardee*, 872 N.W.2d at 393

(quoting *Rodriguez*, 135 S. Ct. at 1615). The dash-camera video provided compelling and virtually indisputable evidence in support of a determination that the unrelated checks prolonged the stop. With the tint violation verified in thirty seconds, all that remained to complete the purpose of the stop were license checks and the issuance of citations. Calculating the times the trooper actually expended on these tasks and giving the trooper the benefit of the doubt on his ability to act expeditiously, we are convinced he could have accomplished the purpose of the stop within thirteen to seventeen minutes. The trooper instead took forty-nine minutes.

The trooper's striking shift to slow motion coincided with dispatch's indication of a delay in the availability of a drug dog. He conducted a second tint-meter test of the windows despite the absence of any evidence that the first test was inaccurate and he asked the same questions of Lopez-Cardenas and the driver that he had posed earlier—all questions unrelated to the purpose of the stop. Had the trooper issued the citations promptly, Lopez-Cardenas would have been on her way more than half an hour earlier. *See id.* at 388 (noting the trooper "admitted that if he had only focused on issuing warnings for the observed traffic violations, the entire stop would take something like ten, eleven, or twelve minutes").

At the suppression hearing, the trooper essentially conceded he was engaged in criminal interdiction efforts rather than highway safety pursuits. *See id.* ("[The trooper] acknowledged that he was engaged in criminal interdiction work . . . ."). This concession together with the totality of circumstances as evinced in the dash-camera video lead us to conclude the unrelated questioning

and unrelated checks with other law enforcement officers prolonged the stop. As the Court stated in *Rodriguez*, the trooper could not "earn bonus time" for expeditiously resolving the matter that precipitated the stop. 135 S. Ct. at 1616.

Our analysis cannot end with our conclusion that the trooper unconstitutionally prolonged the stop. We must next "ask whether individualized suspicion to justify a dog sniff would have existed without this delay." *Pardee*, 872 N.W.2d at 396; *see also Rodriguez*, 135 S. Ct. at 1616-17 ("The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation, therefore, remains open for Eighth Circuit consideration on remand."). In other words, we must decide whether the trooper had reasonable suspicion before he impermissibly extended the stop. *See Pardee*, 872 N.W.2d at 391 (concluding a police officer violates the Fourth Amendment where he or she "develop[s] reasonable suspicion of other criminal activity—if at all—only by prolonging the initial stop beyond the time reasonably necessary to execute the" stop's mission). "Reasonable suspicion to stop a vehicle for investigative purposes exists when articulable facts and all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015).

At the suppression hearing, the trooper cited the following arguably suspicious facts: (1) taking an exit without service billboards rather than one of three earlier exits with service billboards, (2) a flashing right turn signal, (3) nervousness, (4) the presence of No Doz pills in the vehicle, (5) the presence of several cell phones in the vehicle, (6) minimal clothes in the vehicle, (7) Lopez-

Cardenas' failure to bring her own children on the trip, (8) their decision to drive rather than fly, (9) the fact they were coming from California, (10) the fact Lopez-Cardenas did not know her niece's precise age, (11) the niece's required return to California within two days, (12) the fact the van was "sitting low," and (13) the fertilizer in the van.

The first factor is a non-starter; the trooper dispelled any concern about the suspicious nature of the exit by confirming with both adult occupants that they were stopping for gas and by confirming that the gas gauge was indeed low. As for the flashing turn signal, the court in *Pardee* found "the oversight of leaving the right signal light on after pulling over" did not provide reasonable suspicion "alone or in combination" with other facts. *Pardee*, 872 N.W.2d at 394; *see also State v. Hanrahan*, No. 12-0012, 2013 WL 4009675, at *3 (Iowa Ct. App. Aug. 7, 2013) (rejecting the State's reliance on the defendant's failure to turn off his right turn signal). Turning to signs of nervousness, the dash-camera video shows scant, if any, indication that the driver or Lopez-Cardenas were unduly apprehensive. To the contrary, Lopez-Cardenas appeared calm, cooperative, and forthcoming in all of her interactions with the trooper. *Cf. Pardee*, 872 N.W.2d at 394 ("The video recordings of the stop also tend to dispel any impression that the occupants were unusually apprehensive . . . ."). The presence of No Doz pills was, at worst, indicative of hard driving. Lopez-Cardenas conceded as much, stating she was going to try to make it back to California with the help of the pills. *See Hanrahan*, 2013 WL 4009675, at *3 (rejecting signs of "long travel" as generating reasonable suspicion). Similarly, the presence of multiple cell phones in a vehicle occupied by three people may have raised suspicions in a bygone era,

but should have been of little concern in this technological age, particularly where one of the four devices turned out to be an IPod. The limited clothing inside the passenger compartment of the vehicle was similarly of little concern given the admittedly short duration of the trip.[2]

We also are hard-pressed to find anything suspicious in Lopez-Cardenas' failure to bring her own children on the trip. As a preliminary matter, it appears the discussion of her children occurred during the prolonged period of the stop, raising doubts about the appropriateness of considering this factor. Assuming without deciding we may consider this factor, Lopez-Cardenas discussed the difficulties of traveling with young children, said she was simply going to Chicago to pick up her husband, and disclosed the children were staying with her mother-in-law at home in California, where she lived.

As for Lopez-Cardenas' decision to drive rather than fly, she testified her husband did not like to fly. *See United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017) (concluding defendant's refusal to fly did not generate reasonable suspicion); *United States v. Salzano*, 158 F.3d 1107, 1112 (10th Cir. 1998) (rejecting Government's assertion that taking a motor home across the country instead of flying generated reasonable suspicion to prolong a detention).

We turn to the California connection. As we have previously stated, the decision to ascribe bad motives to individuals traveling from California "paint[s] with a broad and unconstitutional brush." *Hanrahan*, 2013 WL 4009675, at *3

---

[2] In addition, the trunk contained a large duffel bag. Lopez-Cardenas said the bag belonged to the driver. *Cf. United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) (finding the absence of luggage in the passenger compartment failed to generate any reasonable suspicion because it was "eminently reasonable to store luggage in the trunk of an automobile when traveling").

(citing *Beck*, 140 F.3d at 1138).  We reject the notion that California as the starting point of a trip in and of itself generates reasonable suspicion to prolong a stop.

Next up is the presence of the niece in the vehicle and, in particular, the trooper's assertion that Lopez-Cardenas did not know her age and needed to get her back to California for school in two days.  The driver and Lopez-Cardenas separately identified the child as a relative.  When Lopez-Cardenas was asked about the child's age, she appeared to forward the trooper's question to the child.  The child answered that she was twelve.  As for the quick turn-around time of the trip in order to get the child back to California, Lopez-Cardenas said the child was on vacation and, laughingly stated, "I didn't know it was going to be so far."

Reasonable suspicion requires more than "[a]n unparticularized suspicion or hunch."  *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997).  As noted earlier, it requires an examination of "what the police in fact do."  *Rodriquez*, 135 S. Ct. at 1616.  If the trooper had a hunch of human trafficking, he did not act on it.  In his multiple calls to law enforcement offices and officers, he failed to mention the possibility of child abduction.  *Cf. Hoover v. Walsh*, 682 F.3d 481, 488, 497-98 (6th Cir. 2012) (noting officers requested confirmation of a father's story about a child in the vehicle and obtained information from the child's mother that she believed the father was trying to escape with the child, giving them reasonable suspicion to extend a traffic stop).  Whatever the trooper's subjective belief about the girl's presence, the articulable facts do not support a reasonable belief that Lopez-Cardenas was engaged in child trafficking.

The second to last factor—the low positioning of the trunk—was dispelled by the trooper at the outset. He asked Lopez-Cardenas about this observation and she consented to have him search the trunk-area. He barely glanced inside and said "thank you." We conclude the low-riding trunk could not support a finding of reasonable suspicion to prolong the stop.

We are left with the trooper's statement at the suppression hearing that he saw fertilizer in the van and the fertilizer might be used in bomb-making or terrorist activity. The dash camera raises doubts about whether the trooper even initially saw the fertilizer when he opened the trunk. As noted, he simply glanced into the back from a slight distance, thanked Lopez-Cardenas, and returned to his vehicle. He did not mention fertilizer to any of the law enforcement offices or officers to whom he spoke during the extended stop of the vehicle. Notably, a subsequent search of the vehicle at the law enforcement post uncovered the fertilizer beneath other items, including the large duffel bag, again raising doubts about whether the trooper saw the fertilizer during the stop. We conclude the trooper's post-hoc discussion of fertilizer as indicative of terrorist activity was objectively not a concern at the time of the vehicle stop and was insufficient to generate reasonable suspicion to prolong the stop.

In sum, the trooper unconstitutionally prolonged the stop of the vehicle. Evidence gained as a result of the unconstitutional detention should have been suppressed. Suppression of the evidence affects the findings of guilt on the drug-possession charge as well as the child-endangerment charge, which was premised on the presence of drugs in the vehicle. We reverse the convictions on

both charges and remand for suppression of the drug evidence and further proceedings consistent with this opinion.

### III. Ineffective Assistance Claims

Lopez-Cardenas argues trial counsel was ineffective in (1) failing to preserve error on the motion for judgment of acquittal on the child endangerment charge and (2) failing to object to testimony by a caseworker for the department of human services that a child abuse report against her was administratively determined to be "founded." In light of our remand, we need not address these issues.[3]

### IV. Conclusion

We reverse Lopez-Cardenas' convictions for possession of marijuana with intent to manufacture and child endangerment and remand the case to the district court for suppression of the drug evidence and further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[3] With respect to the second claim, *State v. Huston*, 825 N.W.2d 531, 539 (Iowa 2013) held "the district court abused its discretion by allowing the jury to hear testimony [a] child abuse complaint against [the defendant] was founded."