# IN THE COURT OF APPEALS OF IOWA

No. 19-2120
Filed February 17, 2021

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**OTONIEL DECANINI-HERNANDEZ,**
 Defendant-Appellant.

_____

Appeal from the Iowa District Court for Washington County, Crystal S. Cronk, Judge.

Otoniel Decanini-Hernandez appeals his conviction of possession of a firearm by a felon. **AFFIRMED.**

R.E. Breckenridge of Breckenridge Law P.C., Ottumwa, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester and Bridget A. Chambers, Assistant Attorneys General, for appellee.

Heard by May, P.J., and Greer and Schumacher, JJ.

**MAY, Presiding Judge.**

A jury convicted Otoniel Decanini-Hernandez of possession of a firearm by a felon. On appeal, Decanini-Hernandez argues (1) the district court erred in failing to suppress statements Decanini-Hernandez made without the benefit of *Miranda*[1] warnings and (2) the district court abused its discretion by excluding evidence that one of the State's witnesses faced drug-related charges. We affirm.

**I. Background Facts and Proceedings**

Sergeant Darren Dennler is a twenty-four-year veteran of the Washington County Sheriff's Department. On the night of February 1, 2019, Dennler was dispatched to investigate a report of "shots fired at a hog shed in the southeast part of the county." Dennler understood he would be the only officer responding to the scene.

As Dennler approached the scene, he observed a maroon vehicle that was suspected to be involved with the shooting. Dennler saw the vehicle pull into the driveway of a residence. Dennler pulled up behind the vehicle and turned on his cruiser's "scene lights," which are white lights (not the "red and blues"). Dennler used these lights because "[i]t was dark."

Two occupants exited the maroon vehicle. Dennler commanded them to approach his cruiser and put their hands on the hood. He gave this command because, given the nature of a "shots fired" call, Dennler was worried for his safety. As Dennler explained, "I have two suspects that are possibly armed, and I'm by myself with back-up kind of, probably, fifteen minutes away."

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The two suspects—later identified as Decanini-Hernandez and a Scott Crow—obeyed Dennler's commands. While approaching the cruiser, Crow asked Dennler "if this was about the gunshots or the shooting, them shooting earlier." Dennler said it was. Dennler asked where the gun was. Crow advised that the gun—a rifle—was in his car, the maroon vehicle. Dennler patted them down "to ensure safety, that they had no weapons." Dennler found no weapons on them, but he did find marijuana and paraphernalia in Crow's jacket. Decanini-Hernandez confirmed that the residence was his.

While Dennler waited for back-up to arrive, he began the process of determining whether someone had actually been shooting at the hog barn. He asked Crow and Decanini-Hernandez "where they were doing the shooting at." Crow responded, "in the backyard." Dennler asked "toward what?" Decanini-Hernandez responded by pointing behind himself, in the direction of his residence. Crow explained they were shooting at a tree in a field behind the residence. Decanini-Hernandez added "there's a pond back there."

After a few minutes, another officer arrived and secured the rifle. Additional officers arrived soon after. One of them was Deputy Nathan Schmuecker, who is also with the Washington County Sheriff's Department. After checking in with Sergeant Dennler, Schmuecker contacted dispatch and requested a "CCH," or check of criminal history. The CHH would reveal, among other things, whether Crow or Decanini-Hernandez "had a disqualifier that does not allow them to possess a firearm."

Meanwhile, Crow and Decanini-Hernandez remained in front of Dennler's cruiser. But with the rifle secured—plus several additional officers present—the

mood at the scene became more relaxed. Crow and Decanini-Hernandez were allowed to put their hands in their pockets. Video footage from Dennler's cruiser shows Crow and Decanini-Hernandez chatting with officers. Decanini-Hernandez can be seen laughing, talking with his hands, and walking around on and near the driveway.

Eventually—the video evidence shows—Crow and Decanini-Hernandez took officers back behind the residence to where the shooting occurred. They all walked together as a group. Crow led the way while the officers and Decanini-Hernandez followed. At times, Decanini-Hernandez walked behind at least one officer.

At trial, two of the officers explained about what happened during this trip behind the residence. Sergeant Dennler testified as follows:

> [T]hen we went and checked to see if there was any damage or where they were shooting from to see if it could be hit.
> Q. Did you go to see where the defendant and Scott Crow were shooting from? A. Yes.
> **Q. And did you ask the defendant where he was shooting from? A. Yes.**
> **Q. And did he say anything in response? A. He pointed to a place on the ground and said here.**
> Q. Did you take any pictures of the scene that night? A. Yes, I did.
> . . . .
> Q. Sergeant Dennler, I'm showing you what I have marked as State's Exhibit 2. Can you identify this picture for me, please? A. Yes, it's a tree they said they were shooting at.
> . . . .
> Q. What happened after this? A. After we identified where they were shooting at and what they were shooting at, we went back to the front of the [residence] out by our cars.

Deputy Schmuecker testified follows:

> Q. . . . **[D]id you ask the defendant whether he fired any rounds from this [rifle]** that's in State's Exhibit 1?

. . . .
A. **I did.**

Q. **And what did the defendant say?** A. **He advised that they were shooting, and he showed me where he had shown Sergeant Dennler where they had shot at the tree**, which was behind the [residence].

(Emphasis added.)

After several minutes, the group came back from their trip behind the residence. Crow and Decanini-Hernandez resumed standing around and chatting with law enforcement officers. Again, video evidence shows Decanini-Hernandez laughing, talking with his hands, walking around on and near the driveway, and putting his hands in his pockets.

Perhaps fifteen or twenty minutes later, dispatch provided Schmuecker with an important piece of information: Decanini-Hernandez had a felony conviction in Texas. Schmuecker learned this information while sitting in his cruiser, which was parked behind Dennler's. After learning this, Schmuecker walked back to the front of Dennler's cruiser, where Crow and Decanini-Hernandez were still chatting with officers. Schmuecker then confirmed with Crow and Decanini-Hernandez that each had fired the rifle. Schmuecker then confronted Decanini-Hernandez by saying, "You, sir, are a felon." At that point, Decanini-Hernandez denied shooting the rifle. Instead, Decanini-Hernandez explained that he had only held and aimed the rifle.

Later that evening, officers arrested Decanini-Hernandez for possession of a firearm by a felon, a class "D" felony, in violation of Iowa Code section 724.26(1) (2019). Soon after, the State filed a trial information charging the same offense.

Decanini-Hernandez filed a motion to suppress statements he made to police without the benefit of *Miranda* warnings. Following a hearing, the district court entered an order granting the motion in part and denying it in part. The court declined to suppress statements made by Decanini-Hernandez *before* Deputy Schmuecker asked questions concerning Decanini-Hernandez's "prior [felony] conviction and being a felon in possession of a weapon." The court reasoned that, up until those questions were asked, Decanini-Hernandez "was not placed in custody." But the court suppressed statements made by Decanini-Hernandez *after* Deputy Schmuecker began asking those questions.

As trial approached, the State filed motions in limine. Among other things, the State asked the court to exclude "improper impeachment evidence," namely, evidence that Crow faced charges for possession of marijuana and drug paraphernalia. Decanini-Hernandez resisted, claiming he should be able to cross-examine Crow about the charges because they would impact his motives in testifying. The court granted the State's motion.

At trial, Decanini-Hernandez stipulated to his prior felony conviction. So the only disputed issue was whether he had possessed a firearm, the rifle found in Crow's vehicle. As already discussed, the State called Sergeant Dennler and Deputy Schmuecker. The State also called Crow. Consistent with his statements at the scene, Crow confirmed that Decanini-Hernandez had fired the rifle.

After the State finished its direct examination of Crow, Decanini-Hernandez asked the court to reconsider its prior ruling excluding evidence of the drug-related charges against Crow. In support, Decanini-Hernandez made an offer of proof by questioning Crow. Relevant portions are excerpted here:

Q. Okay. During the search Officer Dennler retrieved some items off your person, didn't he? A. That has nothing to do with this case, sir, and I was told I do not discuss it with you.

Q. Sir, I'm asking questions. A. I'm aware.

Q. Were any items taken off your person? A. Yes, sir, but that has nothing to do with why I'm here.

Q. Did you see any of the items that were taken off your person? A. I'm well aware, sir, and I will not discuss this with you because I don't have to.

. . . .

THE COURT: Are you asserting your Fifth Amendment rights?

THE WITNESS: Yes.

. . . .

[DEFENSE COUNSEL]: You—You made statements regarding Mr. Decanini-Hernandez's alleged use of the [rifle] that night; correct? A. Yes, sir.

Q. That was after a pat-down search by law enforcement; correct? A. Yes, sir.

Q. From law enforcement's pat-down search . . . did you see items recovered from your person? A. Yes, sir.

Q. To be blunt, you have been charged with possession of a controlled substance or drug paraphernalia in this case; correct—or in Washington County; correct? A. I'm accessing my right, however you say that again, Your Honor.

THE COURT: Are you asserting your Fifth Amendment—

THE WITNESS: Asserting my Fifth Amendment.

. . . .

[DEFENSE COUNSEL]: Okay. Are you aware that you have been charged by public record with a crime involving controlled substances? A. Asserting my Fifth again.

Q. Are you aware that there is a potential for plea negotiations in your case? A. Yes, I'm aware.

Q. You are aware of that? A. Yes.

Q. Have you ever dealt with the plea negotiation process before? A. No, sir.

Q. And just for the record, are the charges against you case numbers SRIN011424 and SMSM042123? A. I do not know my case numbers, sir.

Q. And are those allegations possession of marijuana and drug paraphernalia? A. Asserting my Fifth, sir.

Q. When you—You have not been given a plea offer by the State at this time; correct? A. No, sir.

Q. And coming here today, do you have any hopes of garnering [a] favorable plea offer? A. Not here for me, sir.

Q. But do you have hopes of having a favorable plea offer from the State? A. No, sir.

> Q. You do not have hopes of a favorable plea offer? A. I don't understand your question.
>
> Q. Plea offers would—You understand what a plea offer is? A. Yes, I understand that.
>
> Q. Are you—Is it your hope to ultimately negotiate to a lesser charge? A. For what?
>
> Q. For the cases involving—in which you have been charged with, possession of controlled substance and possession of drug paraphernalia? A. Asserting my Fifth again.
>
> Q. Okay. When you were subpoenaed to testify, had these charges been brought against you already? A. Yes.
>
> Q. And you have had an opportunity to speak with your legal counsel about your testimony today? A. Yes.
>
> Q. And feel free to assert any right you have on this. Did you and your attorney at any point discuss hopes of a plea negotiation?
> A. I don't want to discuss what me and my attorney discuss here.

Decanini-Hernandez then renewed his argument that he should be permitted to cross-examine Crow about the fact he was "aware of charges against him" and of "the plea negotiation process." This evidence, Decanini-Hernandez argued, had "probative value as to [Crow's] motive in testifying" and as to the "veracity and credibility of [Crow's] testimony."

In response, the State asked these questions of Crow:

> Q. Mr. Crow, do you remember talking to me on the phone?
> A. Yes, sir.
>
> Q. Did I make any promises or threats to you about your pending charges in response to you coming here today? A. No, sir.
>
> Q. In fact, what did I tell you about those pending charges?
> . . . .
> A. Do not discuss them, sir.
> . . . .
> Q. Did you talk to your attorney before today? A. Yes, sir.
>
> Q. Did law enforcement make any promises to you or any forces or demand your presence here today? A. No, sir.
>
> Q. Did I make any kind of offer to you? A. No, sir.

The court then reaffirmed its prior ruling excluding evidence of the drug-related charges against Crow. Ultimately, the jury found Decanini-Hernandez guilty of possession of a firearm as a felon.

**II. Issues on Appeal**

On appeal, Decanini-Hernandez contends (1) the district court erred in failing to suppress his statements at the scene because officers did not give him *Miranda* warnings and (2) the district court abused its discretion by excluding evidence that Crow faced drug-related charges.

**III. Standards of Review**

We apply different standards of review to different issues. We review suppression rulings de novo. *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017). "[W]e make 'an independent evaluation of the totality of the circumstances as shown by the entire record.'" *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017) (quoting *In re Pardee*, 872 N.W.2d 384, 390 (Iowa 2015)). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Id.* (quoting *Pardee*, 872 N.W.2d at 390).

Conversely, we generally review evidentiary rulings for an abuse of discretion. *State v. Rodriquez*, 636 N.W.2d 234, 240 (Iowa 2001); *but see State v. Buelow*, 951 N.W.2d 879, 884 (Iowa 2020) ("The standard of review for hearsay, however, is for errors at law."). The party challenging the ruling bears the burden of establishing the district court abused its discretion. *State v. Plaster*, 424 N.W.2d 226, 232 (Iowa 1988).

**IV. Discussion**

A. Suppression of statements

We begin by addressing Decanini-Hernandez's argument that, because officers did not give him *Miranda* warnings, the Fifth Amendment to the United

States Constitution prevented admission of his incriminating statements to officers. Although the district court suppressed some of those statements, Decanini-Hernandez contends the court should have suppressed all of them. We disagree.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The traditional understanding of the Fifth Amendment only required the government to establish the voluntariness of a confession before it could be admitted into evidence against a criminally accused." *State v. Osborn*, No. 16-1066, 2018 WL 4922938, at *3 (Iowa Ct. App. Oct. 10, 2018). "*Miranda*, however, 'changed the focus of much of the inquiry.'" *Id.* (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). "The *Miranda* Court 'concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.'" *Id.* (alteration in original and quotation marks omitted) (quoting *Dickerson*, 530 U.S. at 435). "Because of this concern, the *Miranda* Court constructed a prophylactic rule that 'established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with' certain warnings or advisories." *Id.* (quoting *Dickerson*, 530 U.S. at 435). "[T]he person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* (alteration in original) (quoting *Miranda*, 384 U.S. at 444).

But "[n]ot every confession obtained absent the *Miranda* warnings is inadmissible." *Id.* at *4. "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question." *Id.* (alteration in original) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." *Id.* (quoting *Mathiason*, 429 U.S. at 495). "If a defendant is not in custody, '*Miranda* inquiry is not triggered.'" *Id.* (quoting *State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989)).

So when is a suspect in "custody"? "For purposes of the Fifth Amendment, a suspect is in custody as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *State v. Tyler*, 867 N.W.2d 136, 171 (Iowa 2015) (quotation marks and citation omitted). "[A] court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there was "a formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Id.* at 171–72 (alteration in original) (citation omitted). "In deciding whether a suspect is in custody at a given time, 'we examine the extent of the restraints placed on the suspect during the interrogation in light of whether "a reasonable [person] in the suspect's position would have understood his situation" to be one of custody.'" *Id.* (citation omitted).

We consider four factors in making this determination:

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [their] guilt; and (4) whether the defendant is free to leave the place of questioning.

*Id.* (quoting *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997)).

Our courts have also identified some specific situations in which police detention generally does not constitute "custody" for Fifth Amendment purposes. Traffic stops are an example. *See, e.g.*, *State v. Scott*, 518 N.W.2d 347, 350 (Iowa 1994) ("The temporary detention of a motorist in an ordinary traffic stop is not considered 'in custody' for purposes of *Miranda*."). Although a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers," the United States Supreme Court has held that persons "temporarily detained" for an "ordinary traffic stop . . . are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 436, 440 (1984). This remains true, we have held, even if the driver is "asked to perform field sobriety tests." *State v. Quintero-Labrada*, No. 19-0544, 2020 WL 6482726, at *2 (Iowa Ct. App. Nov. 4, 2020) (citing *In re S.C.S.*, 454 N.W.2d 810, 814 (Iowa 1990)).

A *Terry* stop is another example. Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer with reasonable suspicion that criminal activity is afoot may briefly detain a suspect to investigate the circumstances giving rise to that suspicion." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). "One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning." *Id.* Indeed, as our supreme court has observed, "the right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *Scott*, 518 N.W.2d at 350 (quoting *United States v. Oates*, 560 F.2d 45, 63 (2d Cir.1977)). Moreover, "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed

and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (alteration in original) (quoting *Terry*, 392 U.S. at 24). That sort of patdown is "a rather routine component of a *Terry* stop." *Pelayo-Ruelas*, 345 F.3d at 593. Even so, the "temporary and relatively nonthreatening detention involved in a . . . *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010).

When analyzing whether Decanini-Hernandez was in *Miranda* custody when he made incriminating statements, we believe it is helpful to divide his encounter with police into three periods: (1) an initial period, when Dennler responded to the shots-fired call on a dark night in rural Washington County; (2) a middle period—after more officers arrived, the rifle was secured, and the scene became more relaxed—when Crow and Decanini-Hernandez took officers behind the residence to show exactly where the shooting occurred; and (3) a final period, when Schmuecker confronted Decanini-Hernandez about his felony conviction and, ultimately, Decanini-Hernandez was arrested. One reason for this division is that the district court suppressed Decanini-Hernandez's statements during the final period, that is, his statements *after* Schmuecker confronted him about the felony conviction.[2] So our only task is to determine whether, in addition, the district court

---

[2] The trial court put it this way: "Based upon the record made, the court finds that statements made by the defendant prior to the questions by Deputy Schmu[e]cker regarding his prior conviction and being a felon in possession of a weapon are not suppressed as the defendant was not placed in custody; defendant's statements subsequent to this are hereby suppressed."

should have suppressed Decanini-Hernandez's statements from the initial and middle periods.

Following our de novo review, we conclude the district court properly declined to suppress statements made during both of those periods. We start our discussion with the initial period, when Dennler first encountered Crow and Decanini-Hernandez while responding to the shots-fired call on a dark night in rural Iowa.

From our review of the record—and especially the video footage from Dennler's cruiser—we believe the initial period amounted to a standard *Terry* stop. The encounter only occurred because Dennler reasonably suspected criminal activity, namely, someone shooting a gun at a pork facility. *See State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002) (recognizing an investigatory stop is permissible when the officer has "specific and articulable cause to reasonably believe criminal activity is afoot" (quoting *State v. Heminover*, 619 N.W.2d 353, 358 (Iowa 2000))). And Dennler reasonably suspected Crow and Decanini-Hernandez could be "armed and presently dangerous." *See State v. Radke*, No. 13-0516, 2014 WL 2600225, at *2 (Iowa Ct. App. June 11, 2014) (quoting *Terry*, 392 U.S. at 29–30). Given these circumstances, *Terry* and its progeny authorized Dennler to (1) require Decanini-Hernandez to put his hands on the cruiser, (2) pat him down for weapons, and (3) ask questions about the reported shooting. All of these actions were consistent with the purposes of a *Terry* stop and accompanying patdown, namely, to permit police to conduct a limited investigation of suspected crime while assuring officer safety. *See State v. Gates*, No. 09-1241, 2010 WL 2598334, at *4 (Iowa Ct. App. June 30, 2010) (noting the purpose for allowing a search is to "allow the

officer to pursue his investigation without fear of violence" (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972))). And so we do not believe Dennler's actions support a finding of "*Miranda* custody." *See Shatzer*, 559 U.S. at 113 (noting the "temporary and relatively nonthreatening detention involved in a . . . *Terry* stop . . . does not constitute *Miranda* custody").

It is true, though, that even when a police encounter begins as a *Terry* stop, *Miranda* safeguards can become necessary if—as the stop progresses—police actions "curtail" the citizen's "freedom of action . . . to a degree associated with formal arrest." *Pelayo-Ruelas*, 345 F.3d at 592 (quoting *Berkemer*, 468 U.S. at 440–42). We do not think that happened here. Decanini-Hernandez has not identified—and we have not found—anything that "occurred during the *Terry* stop to convert the encounter to one involving custody requiring *Miranda*." *See State v. Hillery*, No. 19-0725, 2020 WL 4200867, at *6 (Iowa Ct. App. July 22, 2020). The length of the initial period was not extended beyond what was necessary "to complete" Dennler's twin "mission[s]" of investigating the reported shooting while assuring officer safety. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (noting "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission"). Moreover, Decanini-Hernandez was never handcuffed; he was never placed in a patrol vehicle; he was never separated from his companion, Crow; he was never transported to a police station; and, in fact, he was never even asked to leave the property outside his own home during this initial period. *Cf. State v. Bradford*, 620 N.W.2d 503, 507 (Iowa 2000) (discussing circumstances that exceeded bounds of an investigatory stop for purposes of the

Fourth Amendment).  Moreover, during this time, Dennler's questions never evolved from "ordinary fact-finding into a highly confrontational and accusatorial proceeding."  *See State v. Schlitter*, 881 N.W.2d 380, 407 (Iowa 2016) (Appel, J., concurring in part and dissenting in part).  Rather, Dennler's questioning was "direct, non-confrontational, investigative in nature, and not coercive or threatening."  *See State v. Davis*, No. 08-1942, 2009 WL 4116322, at *5 (Iowa Ct. App. Nov. 25, 2009).

Because we believe the initial period involved only an ordinary *Terry* stop, we conclude *Miranda* warnings were not required then.  *Cf. United States v. McGauley*, 786 F.2d 888, 890–91 (8th Cir. 1986) ("No Miranda warning is necessary for persons detained for a *Terry* stop." (citing *Berkemer*, 468 U.S. 420)).  We turn next to the middle period, during which Decanini-Hernandez walked with officers behind his residence and showed them where he had been shooting.

To decide whether Decanini-Hernandez was in custody during this period, we consider the four factors already mentioned, which are sometimes called the *Countryman* factors.  *See* 572 N.W.2d at 558; *see also State v. Majouk*, No. 19-1850, 2020 WL 7385275, at *3 (Iowa Ct. App. Dec. 16, 2020); *Osborn*, 2018 WL 4922938, at *5–6.  This "four-factor test" provides "guidance" when making the ultimate determination of "whether a reasonable person in" Decanini-Hernandez's position "would understand" themselves "to be in custody."  *Countryman*, 572 N.W.2d at 558.

When applying the first *Countryman* factor, we "consider the circumstances concerning how the individual was summoned to the interrogation."  *Schlitter*, 881 N.W.2d at 396.  For at least two reasons, this factor does not support a finding of

custody in the middle period. First of all, Decanini-Hernandez was never "summoned to" a separate location such as a police office. *See id.* He was already on his own property when officers arrived—and he stayed there throughout the encounter. Moreover, although Dennler commanded Decanini-Hernandez to keep his hands on the car during the initial period, it appears no such "commands" were issued during the middle period. Rather, as noted, Decanini-Hernandez was permitted to put hands in pockets, gesture with his hands, and so on.

The second *Countryman* factor concerns "the purpose, place, and manner of interrogation." *Id.* This factor does not support a finding of custody here. The "purpose" of officers' inquiries was to investigate—to determine the facts surrounding the reported hog barn shooting—not to confront. *See id.* The "place" of the inquiry was, as noted, Decanini-Hernandez's own property. *See State v. Schwartz*, 467 N.W.2d 240, 245 (Iowa 1991) ("Regarding [the defendant], no warning was necessary before incriminating statements were made to the deputy sheriff while questioning him in his yard."). And the "manner" of the officers' inquiries was conversational, even friendly. It was not at all "confrontational or aggressive." *See Countryman*, 572 N.W.2d at 558.

The third *Countryman* factor "looks at 'the extent to which the defendant is confronted with evidence of [their] guilt.'" *Schlitter*, 881 N.W.2d at 397 (quoting *Countryman*, 572 N.W.2d at 558). This factor also weighs against a finding of custody. "Absolutely no evidence" of his exposure as a felon-in-possession "was presented to" Decanini-Hernandez during the middle period. *See Countryman*, 572 N.W.2d at 558.

The fourth *Countryman* factor addresses "whether the individual was free to leave the place of questioning." *Schlitter*, 881 N.W.2d at 397. For this factor, the analysis is somewhat more nuanced. Dennler testified that, while the officers were investigating the shooting, Decanini-Hernandez was not free to leave. As the State points out, though, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S. at 112. We do not "accord it 'talismanic power,' because *Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Id.* For example, as already discussed, although "a traffic stop or *Terry* stop" undoubtedly limits—indeed, eliminates—a citizen's freedom-to-leave, those "temporary and relatively nonthreatening detention[s]" do not "constitute *Miranda* custody." *Id.* at 113; *see also Pelayo-Ruelas*, 345 F.3d at 592 (noting "[o]ne is not free to leave a *Terry* stop").

Similarly, in this case, important circumstances serve to counterbalance concerns about Decanini-Hernandez's detention. First, officers had compelling reasons to detain Decanini-Hernandez: (1) they needed to finish investigating the shooting and (2) they did not want him to go in his house or a vehicle—and possibly come back with another weapon. Those twin interests—the need to investigate possible crime while protecting officer safety—are the same interests that justify substantial restrictions on freedom during *Terry* stops and traffic stops.

Second, although he was not wholly free to leave, Decanini-Hernandez enjoyed remarkable freedom of movement. "[T]he degree of physical restriction placed on the individual" was extremely low throughout the middle period. *Schlitter*, 881 N.W.2d at 397. As in the initial period, Decanini-Hernandez was

never handcuffed, placed in a patrol vehicle, separated from Crow, transported to a police station, or even asked to leave his own property. He also had free use of his hands, including freedom to gesture broadly, to put his hands in his pockets, and even to help Crow fix his coat. He was also free to move about the driveway and adjoining area as he chatted with officers.

We make special mention of the trip behind Decanini-Hernandez's residence, during which he made crucial admissions about where he shot the rifle. While we do not have video footage of the entire trip, we were able to review the moments in which Decanini-Hernandez, Crow, and the officers departed the driveway and proceeded past the side of Decanini-Hernandez's residence. We find it significant that, as the group marched out into the dark night, Decanini-Hernandez was allowed to walk *behind* at least one officer.[3] We emphasize "behind" because, normally, we would expect a person in custody to walk in front of officers. A person in custody is not usually trusted to walk behind their custodians.

Considering the record as a whole, we do not think a reasonable person in Decanini-Hernandez's position would have understood their "situation to be one of custody" during the initial or middle periods. *See Tyler*, 867 N.W.2d at 172 (quotation mark and citations omitted). So the Fifth Amendment did not require *Miranda* warnings. *See id.* And there were no grounds to suppress Decanini-Hernandez's statements.

---

[3] On the video marked as Exhibit 3, these events begin at 18:33. At 18:33:06, for example, it appears Decanini-Hernandez is behind all of the officers.

B. Exclusion of drug-related charges

We turn next to Decanini-Hernandez's argument that he should have been permitted to impeach Crow with evidence that drug-related charges were pending against Crow when the State called him to testify. Decanini-Hernandez claims this evidence would have shown Crow "was motivated to testify falsely against" Decanini-Hernandez "to keep the light off evidence of his own illegal activity" and "to escape charges." The district court excluded evidence of the drug-related charges as more prejudicial than probative. We find no abuse of discretion.[4]

While "not specifically mentioned" in our rules, "inquiry about a witness's bias, interest, or motive for testifying in a certain way" is a "time-honored" cross-examination technique. Thomas A. Mauet & Warren D. Wolfson, *Trial Evidence* § 12.4 (7th ed. 2020) [hereinafter *Trial Evidence*] (discussing the Federal Rules of Evidence). In other words, does the witness believe they have "something to gain or lose by testifying in a certain way?" *Id.* Often, this sort of evidence is plainly relevant to the witness's credibility. *See id.*; *cf. Gregory v. Gregory*, 82 N.W.2d 144, 148 (Iowa 1957) ("But credibility of the witnesses also depends, of course, on whether they have any personal interest, motive or purpose to remember so as to shade meanings of words and actions relating to the testimony."). And so it is presumably admissible. *See* Iowa R. Evid. 5.402 (stating "[r]elevant evidence is admissible, unless" excludable under another rule, statute, or constitution); *see also Trial Evidence* § 12.4.

---

[4] Decanini-Hernandez raises no confrontation issues under the Sixth Amendment to the United States Constitution or article I, section 10 of the Iowa Constitution.

Even so, evidence of a witness's bias, interest or motive remains "subject to the strictures" of Iowa Rule of Evidence 5.403. *See Trial Evidence* § 12.4 (discussing Federal Rule of Evidence 403). Rule 5.403 authorizes the district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." This balancing of probative value against competing dangers is a classic "judgment call on the part of the trial court." *Rodriquez*, 636 N.W.2d at 240. As the court explained in *Rodriguez*:

> Analyzing and weighing the pertinent costs and benefits [of admitting prior acts evidence] is no trivial task. Wise judges may come to differing conclusions in similar situations. Even the same item of evidence may fare differently from one case to the next, depending on its relationship to the other evidence in the case, the importance of the issues on which it bears, and the likely efficacy of cautionary instructions to the jury. Accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers.

*Id.* (alteration in original) (quoting 1 John W. Strong, *McCormick on Evidence* § 185, at 647–48 (5th ed. 1999)).

Applying these principles here, we do not conclude the district court exceeded its broad discretion by excluding evidence of the drug-related charges Crow was facing. The district court could have reasonably concluded this evidence had relatively low probative value. No evidence suggested that Crow expected—or could reasonably expect—leniency as to his drug charges in return for truthfully testifying against Decanini-Hernandez. Nor is this a situation in which an accused could hope to reduce their own exposure by falsely implicating another. The topic

of Crow's testimony—whether Decanini-Hernandez used a rifle—was simply not relevant to whether Crow unlawfully possessed drugs or paraphernalia.

Conversely, the district court could have reasonably understood that injecting drug charges into this gun trial would not have been a cost-free proposition. As the State points out, the jury might well have placed "[u]ndue emphasis on Crow's misdeeds." And undue emphasis on Crow's misdeeds—his drug use, his criminality—could have distorted the jury's evaluation of Crow's credibility. It also could have distracted jurors "from what they were actually there to determine"—Decanini-Hernandez's "guilt or innocence" as to an unrelated gun crime.

All things considered, we believe admission or exclusion of the drug evidence was a "judgment call" for the trial judge to make in light of her first-hand, "boots on the ground" understanding of the trial as a whole. *See id.* We cannot say Decanini-Hernandez carried his burden of showing that exclusion was an abuse of that discretion.

Moreover, even if the district court had erred in excluding the evidence, we believe any error would have been harmless. "[E]rror in an evidentiary ruling that is harmless may not be a basis for relief on appeal." *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008). Where, as here, "a nonconstitutional error is claimed . . . the test is whether the rights of the objecting party have been 'injuriously affected by the error' or whether the party has 'suffered a miscarriage of justice.'" *Id.* (citation omitted). And "we consider a variety of circumstances in determining the existence of harmless error, including the existence of overwhelming evidence of guilt." *Id.* at 210.

Here, the evidence of guilt was overwhelming. The only disputed issue was whether Decanini-Hernandez shot—or even just held—the rifle. Decanini-Hernandez admitted to two officers that he had shot the rifle. Decanini-Hernandez also showed officers *where* he had shot the rifle. The jury heard both officers testify to Decanini-Hernandez's admissions. And no evidence meaningfully undermined the officers' testimony. So we conclude the evidence that Decanini-Hernandez shot—or at least held—the rifle was overwhelming *even without* Crow's eye-witness account.

**V. Conclusion**

Because we find no reversible error, we affirm.

**AFFIRMED.**