# IN THE SUPREME COURT OF IOWA

No. 21–1133

Submitted September 19, 2023—Filed December 8, 2023

**STATE OF IOWA,**

Appellee,

vs.

**STEPHEN ANDREW ARRIETA,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Worth County, Colleen D. Weiland, Judge.

The defendant appeals the denial of his motion to suppress evidence obtained after a drug dog alerted to the smell of drugs during a commercial vehicle inspection. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Colin Murphy (argued) of Gourley Rehkemper Lindholm, P.L.C., West Des Moines, for appellant.

Brenna Bird, Attorney General, and Joshua A. Duden (argued) and Thomas E. Bakke, Assistant Attorneys General, for appellee.

**OXLEY, Justice.**

Officers are allowed to use a drug dog to conduct a "free air sniff" around the outside of a vehicle during a valid traffic stop without any suspicion that the vehicle contains drugs under the premise that the driver has no expectation of privacy in the air outside the vehicle. Even so, that doctrine is a narrow one. Stopping a vehicle for a traffic violation is itself a seizure, and any conduct that goes beyond investigating the "mission" of the traffic violation is closely scrutinized.

In this case, Stephen Arrieta, a truck driver from Texas, failed a "PrePass" check as he approached a weigh station on Interstate 35 outside Northwood. He pulled into the weigh station, and an Iowa Department of Transportation (DOT) officer undertook a "Level 3" commercial vehicle inspection of the driver's documentation. Well into his inspection, the DOT officer called for a K-9 unit to conduct a free air sniff of the truck and trailer. The drug dog ultimately alerted to the area around the sleeper compartment of the cab, and Arrieta admitted he had a bowl of marijuana inside. Arrieta challenges the district court's denial of his motion to suppress the marijuana on three grounds. First, he argues that the DOT officer engaged in an unlawful seizure when he extended his Level 3 document-only investigation to give the K-9 handler time to get to the weigh station and search his truck, relying on *Rodriguez v. United States*, 575 U.S. 348 (2015). Second, he argues that the K-9 handler engaged in an additional unlawful search when the dog jumped up on the fuel tank of the cab to enable it to smell the area around the sleeper compartment where the marijuana was located, relying on the property-based-search framework delineated in *United States v. Jones*, 565 U.S. 400 (2012), and *Florida v. Jardines*, 569 U.S. 1 (2013). Third, he challenges the reliability of Titan, the drug dog, relying on *Florida v. Harris*, 568 U.S. 237 (2013).

As explained below, we conclude that Arrieta was detained beyond the time needed to complete the Level 3 inspection in violation of the Fourth Amendment to the United States Constitution. That violation requires suppression of the subsequently discovered drugs, so we need not address Arrieta's other arguments. The district court's judgment is reversed and remanded.

## I. Background Facts and Proceedings.

On August 5, 2020, Stephen Arrieta was traveling through Iowa as he hauled a load of insulation from Minnesota to Texas. His semitruck "failed" the PrePass check just north of the Northwood DOT weigh station on I-35, so Arrieta pulled into the weigh station. DOT Officer Taran Waalkens initiated a Level 3 commercial motor vehicle inspection, which involves a document review of the logbook, truck and trailer registrations, fuel tax receipts, and bills of lading. During the ensuing inspection, Waalkens requested assistance from the Worth County K-9 handler to conduct a free air drug dog sniff around the perimeter of the semi as the inspection was being conducted. It was during this sniff that K-9 Titan alerted to the smell of narcotics coming from inside the cab of Arrieta's truck. Arrieta admitted to the officers that he had a small amount of marijuana in the sleeper compartment. A subsequent search of the cab revealed the marijuana, and Arrieta was charged with possession of a controlled substance in violation of Iowa Code § 124.401(5) (2020).

Before trial, Arrieta moved to suppress the evidence seized by the officers, alleging the search violated his constitutional rights under the Fourth Amendment and article I, section 8 of the Iowa Constitution. He advanced four arguments in support of the motion to suppress, three of which he urges on appeal: (1) officers lacked the necessary reasonable suspicion of criminal activity to detain him while waiting for a K-9 to arrive; (2) an impermissible search occurred when the K-9 made deliberate, physical contact with the vehicle by putting its

paws up on the fuel tank to reach the area near the sleeper compartment during the free air sniff; and (3) K-9 Titan was not sufficiently trained and reliable to provide probable cause to support the search of his truck. After a hearing, the district court denied the suppression motion. Arrieta proceeded to a trial on the minutes. He was found guilty of possession of a controlled substance and was sentenced to a fine of $250 and two days in jail, both of which were suspended.

Arrieta appealed the denial of his motion to suppress, and we transferred the case to the court of appeals. The court of appeals affirmed the district court's ruling, concluding that the initial report of a stolen vehicle and the other discrepancies found in Arrieta's logbook justified the length of the stop, which was still ongoing when Deputy Luther arrived with Titan. It concluded that Titan's training and experience satisfied the requirements that a drug dog be sufficiently reliable to support Luther's belief that a search would reveal drugs. Finally, it concluded that the dog jumping up on the side of the truck was not an unconstitutional search, relying on *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007).

We granted Arrieta's application for further review to address whether Arrieta's constitutional rights were violated.

## II. Standard of Review.

We review the district court's denial of a motion to suppress based on deprivation of a constitutional right de novo. *State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017). "This review requires 'an independent evaluation of the totality of the circumstances as shown by the entire record.' " *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011) (quoting *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001)). "Each case must be evaluated in light of its unique circumstances." *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019) (quoting *State v. Coffman*, 914 N.W.2d 240,

244 (Iowa 2018)). We give deference to the district court's findings of fact, but we are not bound by them. *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017).

### III. Was the Traffic Stop Unconstitutionally Extended?

Law enforcement officers often use drug dogs to locate illegal narcotics during traffic stops. As a general matter, unless an officer has reasonable suspicion that a vehicle contains drugs, an officer who otherwise lawfully stops a vehicle cannot detain the vehicle beyond the purpose for the stop to conduct a drug dog sniff. But they can conduct a free air drug dog sniff around the exterior of the vehicle under *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

Arrieta raises several challenges to the district court's denial of his motion to suppress, including his claim that the duration of the stop was impermissibly extended without the requisite reasonable suspicion of criminal activity. The detention of an individual during a traffic stop, even if brief and for a limited purpose, is a seizure within the meaning of the Fourth Amendment. *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). Arrieta does not contest the validity of the initial stop or the Level 3 inspection. Rather, he argues the seizure violated his constitutional rights under the Fourth Amendment and article I, section 8 when he was detained longer than what was reasonably necessary to complete the Level 3 inspection. He further argues the State failed to proffer a sufficient explanation for the delay, demonstrating the officer's improper intent to unduly prolong the inspection to allow time for a K-9 unit to arrive on the scene. We conclude the stop was impermissibly extended beyond a reasonable duration, which renders it an unconstitutional seizure under the Fourth Amendment. With that violation, we need not, and do not, address whether the stop was also impermissibly extended under the Iowa Constitution. *See In re Prop. Seized from Pardee*, 872 N.W.2d 384, 391 n.6 (Iowa 2015).

The controlling precedent for Arrieta's challenge is *Rodriguez*, 575 U.S. 348. That case also involved a free air sniff by a drug dog during a routine traffic stop that revealed the presence of narcotics inside the vehicle. *Id.* at 352. Although the initial stop was valid, the United States Supreme Court held that law enforcement unconstitutionally prolonged the stop beyond what was necessary to effectuate the legitimate purpose for the stop. *Id.* at 354–55. Support for the holding came from underlying facts showing that the officer detained Rodriguez for "seven to eight minutes" beyond the time reasonably needed to "complete th[e] mission" of issuing a warning ticket while he waited for a K-9 unit to arrive. *Id.* at 350–51, 353 (alteration in original) (quoting *Caballes*, 543 U.S. at 407). Absent individualized suspicion, law enforcement may not prolong a traffic stop to conduct unrelated investigations—such as drug dog sniffs—that do not serve the stop's lawful objectives. *Id.* at 354–55.

Federal caselaw makes clear that even *de minimis* extensions of traffic stops are unacceptable under the Fourth Amendment. *E.g.*, *Florida v. Royer*, 460 U.S. 491, 500 (1983) (holding that an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop); *United States v. Landeros*, 913 F.3d 862, 867–68 (9th Cir. 2019) (finding that several minutes of additional questioning to ascertain defendant's identity was impermissible in the absence of independent reasonable suspicion); *United States v. Gomez*, 877 F.3d 76, 91–92 (2d Cir. 2017) (finding evidence unlawfully obtained during a five-to-six-minute traffic stop because the officer impermissibly extended the seizure to ask unrelated questions); *United States v. Stepp*, 680 F.3d 651, 662–63 (6th Cir. 2012) (holding that six minutes of questioning measurably prolonged the traffic stop beyond its original purposes because the topics covered more than just context-framing questions and the extraneous questions lasted a "not insubstantial" amount of time); *United States v. Milton*, 621 F. Supp. 3d

421, 430–32 (S.D.N.Y. 2022) (finding that a delay of "two minutes or so" caused by "investigative inquiries unrelated to motor vehicle violations" unconstitutionally prolonged the traffic stop); *United States v. Cornejo*, 196 F. Supp. 3d 1137, 1152 (E.D. Cal. 2016) (finding eight minutes was an unreasonably long duration "to complete the simple, one-page, written warning citation"); *United States v. Dolson*, 673 F. Supp. 2d 842, 867 (D. Minn. 2009) (finding delay of one minute and twenty-four seconds to call drug task force to be an unlawful extension).

The critical question for courts applying *Rodriguez* is not whether the unrelated investigation occurs before or after the officer issues a ticket, but whether conducting the unrelated investigation adds time to the stop. *Rodriguez*, 575 U.S. at 357. "Just as an officer may not earn 'bonus time' to conduct inquiries for an unrelated criminal investigation by efficiently processing the matters related to the traffic stop, an officer may not consume much of the time justified by the stop with inquiries about offenses unrelated to the reasons for the stop." *Gomez*, 877 F.3d at 91–92 (citation omitted).

We have likewise applied *Rodriguez*'s holding in a variety of factual contexts. In *In re Property Seized from Pardee*, we concluded that a twenty-five-minute traffic stop was unconstitutionally prolonged beyond what was necessary to address the traffic infraction. 872 N.W.2d at 396–97. We rejected the state's reliance on individualized suspicion of additional criminal activity because the officers "developed reasonable suspicion of other criminal activity—if at all—only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings." *Id.* at 391. *Pardee* reiterated the rule delineated by *Rodriguez*: "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 392 (omission in original) (quoting *Rodriguez*, 575 U.S. at 354). *Rodriguez* made clear that the Fourth Amendment will permit certain extraneous investigations that do not

perpetuate the roadside stop, but the stop is lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (alteration in original) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

We applied *Rodriguez*'s rule again in *State v. Salcedo* to hold that an officer cannot utilize delay tactics to prolong a lawful traffic stop until a drug dog arrives on the scene. 935 N.W.2d 572, 579 (Iowa 2019). In that case, the defendant consented to a vehicle search within fourteen minutes of being pulled over, which ultimately revealed marijuana in the trunk before the dog ever arrived. *Id.* at 574–75. Although the stop was objectively short in light of the officer's suppression hearing testimony that it would take anywhere from ten to twenty-five minutes to complete an average traffic stop, we found this stop violated the Fourth Amendment because it was delayed by the officer's actions unrelated to investigating or processing the traffic violation. *Id.* at 576, 580–81. In reaching the decision, we noted that the officer's "complete lack of effort to address Salcedo's specific traffic infraction" was obvious from the evidence, such as body camera footage that showed the officer repeatedly flipping through the pages of a car rental agreement and his admitted failure to ask any questions related to the traffic infraction during the stop. *Id.* at 580. Additionally, we found that the officer was "no closer to completing the mission of the traffic stop than he was prior to inviting Salcedo into his patrol car" to ask him a few questions. *Id.* at 580–81. We agreed with Salcedo's argument that the officer was merely "stringing along the stop until a drug dog arrived" and the delay was "measurable, unreasonable, and in violation of his Fourth Amendment rights." *Id.*

To be clear, there is no time limit on traffic stops. "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per*

*se* time limit on all traffic stops." *Olivera-Mendez*, 484 F.3d at 510. For instance, when complications arise while carrying out the original purposes of the stop, law enforcement may reasonably detain a driver for a longer duration than when a stop is strictly routine. *See, e.g.*, *United States v. Sharpe*, 470 U.S. 675, 685–87 (1985). The specific circumstances of the stop determine the outcome of each case, so courts should conduct a thorough factual inquiry into the record. Therefore, the timeline of relevant facts is particularly pertinent to our decision in this case, and we discuss them in some detail.

At approximately 12:35 p.m., Arrieta's truck "failed" the PrePass, so he pulled into the DOT weigh station. Waalkens met Areitta at his truck at approximately 12:39 p.m. to begin the Level 3 inspection. Due to COVID-19 protocols in place at the time, Waalkens put his email into the "Keep Trucking" app Arrieta used for his logbook so Waalkens could access and review the log without being in close contact. Waalkens then reviewed Arrieta's information from his computer inside the weigh station facility while Arrieta waited in his truck.

Waalkens first scanned the bar codes on Arrieta's driver's license and the registration form for the semi-tractor. The electronic system, which automatically runs a warrant check and checks for current registration, reported that the semi-tractor was stolen. Waalkens followed up with "Cedar Falls state radio" to check the license plate and vehicle identification number (VIN). Although the license plate number was not reported stolen, the VIN again registered as stolen. Waalkens then asked state radio to check with the originating agency to see if the stolen report was still valid while he continued his inspection. Waalkens learned about this issue "right away," which he estimated to be within the first ten minutes. He continued his inspection while he waited for information about whether the stolen report was valid.

As the inspection continued, Waalkens noticed discrepancies in Arrieta's paperwork that he found to be suspicious. The bill of lading showed that Arrieta "was only hauling insulation from Minneapolis all the way back down to Texas," which Waalkens believed was not "fairly common" because "from [his] work experience" only hauling insulation on "that far of a trip . . . wouldn't be a productive trip for the company at that point." Waalkens also identified what he described as inconsistencies from his review of Arrieta's logbook. Arrieta was primarily a local hauler in Texas, and he was not required to maintain a licensed electronic logbook. The Keep Trucking app Arrieta used on his cell phone allowed him to retroactively edit the location, miles, and times. Waalkens noted a few instances in the log where Arrieta had changed duty status locations in Texas with no recorded driving time. The logbook also showed that Arrieta drove the 770 miles "from Edmond, OK to Minneapolis, MN . . . in exactly 11 hours of driving time" the prior day. Waalkens calculated (wrongly)[1] that Arrieta "would have averaged 77 mph during th[e] entire trip." Finally, Waalkens found it suspicious that the logbook "did not specify what [Arrieta] brought up to Minneapolis, but he just had a trip to go all the way up to Minneapolis and then straight back down to Texas." These factors, combined with Waalkens's "know[ledge] that I-35 is a very popular corridor for drug trafficking," led him to request a K-9 unit to further inspect Arrieta's truck.

Waalkens testified he learned about the VIN discrepancy within the first ten minutes of his investigation—after returning to the building and scanning the bar code on the registration. After asking state radio to follow up on the stolen report with the initiating authorities in Arlington, Texas, Waalkens turned to the logbook. He testified he identified discrepancies in the logbook "within 20

---

[1]Driving 770 miles over 11 hours would be an average of 70 mph, not 77 mph (770 ÷ 11 = 70).

minutes of starting the inspection." He estimated it took another "few minutes" each to review the fuel tax receipts, bills of lading, and trailer registration.

Waalkens called state radio to request a K-9 unit shortly before 1:34 p.m.—an hour after he began his inspection but before he received confirmation about whether the stolen truck report was valid. Waalkens testified he "needed to further investigate the log[]book and talk with Mr. Arrieta" when he called for the K-9 unit. When asked to clarify whether, "in addition to discussing with [Arrieta] log[]book issues," there was "any other thing that was not yet completed by the time you contacted state radio for a K-9," Waalkens responded, "Just reviewing the information with the driver."

At 1:34 p.m., while the K-9 unit was en route, state radio told Waalkens not to hold Arrieta based on the stolen VIN report; the Arlington police department had been contacted and reasoned that because the truck's current registration was valid, the report was likely outdated. Waalkens testified that he nevertheless continued holding Arrieta "because he was traveling from Texas to Minnesota[,] . . . the discrepancies in [his] log[]book changes in southern Texas, [and] incorrect mileage on his log[]book." Critically, based on our de novo review of the record, by about 1:34 p.m. Waalkens was done with all of his tasks except going over the inspection with the driver.

Just before 2:00 p.m., the K-9 unit—Worth County Sheriff's Office Chief Deputy Jesse Luther and his dog Titan—arrived at the weigh station. Luther had been in a meeting at the sheriff's office in Northwood, the county seat, about ten miles from the weigh station. When Waalkens's request for a K-9 unit came in, Luther asked his boss for permission to leave for the weigh station. He was granted permission and "left the meeting within minutes."

When Luther arrived with Titan, Arrieta was still in his truck. Luther spoke briefly with Waalkens and Arrieta, and then he and Titan began a free air sniff

of the truck at 2:00 p.m. while Waalkens took Arrieta inside the weigh station to review the paperwork. Luther and Titan first made a clockwise pass around the truck, beginning from the front passenger side of the vehicle. During this first pass, Luther allowed Titan to lead rather than directing him where to sniff. Luther noticed Titan "immediately showed signs of a breathing change" and was "in odor" during the first trip around the truck and trailer. Titan did not ever "alert" during this pass, though.

The team then turned around for a counterclockwise pass. During this pass, Luther cued Titan to sniff particular areas of the truck he wanted Titan to focus on—a process he called "detailing." As they came around the front driver's side corner of the truck, Titan jumped up and placed his paws on the truck twice to reach the areas Luther directed him to sniff. First, Titan placed his front paws on the truck's tire to smell near the engine compartment, and then he placed them on the fuel tank to smell near a seam in the truck's body behind the driver's side door near the sleeper compartment. After smelling the seam, Titan gave an alert that he had found the source of the odor of narcotics by sitting down.

Luther informed Waalkens about the alert, and they questioned Arrieta, who admitted having a "bowl" of marijuana in the sleeper compartment of his truck, which he had smoked the night before to help him fall asleep. Arrieta agreed that Waalkens could retrieve the marijuana, and Waalkens pulled his cruiser behind the truck, advising dispatch that he would be searching the vehicle based on Titan's alert. This was at 2:06 p.m.—an hour and a half after Arrieta first pulled into the weigh station. Waalkens found 0.29 grams of marijuana in Arrieta's sleeper compartment; a search of the rest of the truck and trailer revealed no additional marijuana or other narcotics. Arrieta was arrested and charged with possession of marijuana.

In assessing whether Waalkens unduly prolonged the duration of the stop, we acknowledge that this stop was not "normal" based on the report that Arrieta's truck might be stolen. Under our totality approach, we give proper weight to the additional time required to complete this particular inspection given the officer's collateral investigation to determine if the truck was stolen. Even so, a close review of the record reveals that the inspection should have reasonably been completed before the K-9 unit arrived, and Waalkens no longer had authority to detain Arrieta to conduct the free air sniff.

The district court gave undue weight to Waalkens's asserted need to investigate whether the truck was stolen to excuse the delay. Waalkens learned of the report at the outset, called dispatch, and asked them to follow up. Meanwhile, he continued his investigation, discovering some discrepancies in Arietta's logbook within twenty minutes of starting the inspection. This would have been around 1:00 p.m. He continued reviewing the logbook and other paperwork over the next half hour and—other than talking to Arrieta—was finished with his review when he received word that the stolen report was cleared up at 1:34 p.m. This was approximately twenty-five minutes before Luther and Titan arrived. Thus, even if we assume the officer's calls with state radio added some measurable amount of time, the inspection should have wrapped up shortly after state radio responded.

The evidence in the record reveals that Waalkens was simply waiting inside the weigh station between the time he talked to state radio at 1:34 p.m. and Luther's arrival just before 2:00 p.m. Waalkens testified he was done inspecting the paperwork other than going over it with Arrieta when he called for the K-9 unit, which was before he talked to state radio. So, when he received confirmation that the truck was not stolen at 1:34 p.m., there was no basis for Waalkens to continue holding Arrieta except to go over the paperwork and discuss any

logbook issues with him. Once he received the green light to not hold Arrieta related to the stolen VIN report at 1:34 p.m., Waalkens should have been prepared to talk to Arrieta then. Instead, he waited twenty-five minutes for Luther to arrive before going to get Arrieta from his truck. Although we do not have a bodycam video to reveal what Waalkens was doing in the meantime as we did in *Salcedo*, 935 N.W.2d at 576, Waalkens admitted he only needed to review the paperwork with Arrieta and offered no explanation for not doing that after talking to state radio at 1:34 p.m. He certainly was not acting diligently to complete the purpose of the traffic stop. Waalkens's estimation of the time it took him to review Arrieta's documents and his admission that he only needed to review the paperwork with Arrieta when he called for the K-9 unit reveal that he was "stringing along the stop until a drug dog arrived." *Id.* at 580; *see also State v. Flanagan*, No. 20–0652, 2021 WL 4593222, at *5 (Iowa Ct. App. Oct. 6, 2021) (holding an unconstitutional delay occurred because the officer was less than expeditious in completing his traffic-related mission by asking off-topic questions); State *v. Lopez-Cardenas*, No. 15–2040, 2017 WL 3283279, at *5 (Iowa Ct. App. Aug. 2, 2017) (identifying officer's "striking shift to slow motion" immediately upon discovering the drug dog would be delayed as compelling evidence to support the conclusion that unrelated checks unduly prolonged the traffic stop). Even crediting the unusual circumstances present in this case, we conclude that here, as in *Salcedo,* the delay was "measurable, unreasonable, and in violation of his Fourth Amendment rights." 935 N.W.2d at 581.

On a motion to suppress evidence obtained by a warrantless search, "[t]he defendant has the burden of proof as to whether a seizure occurred," *Fogg*, 936 N.W.2d at 668, whereupon the burden shifts to the state to prove that its warrantless actions were justified, *State v. Torres*, 989 N.W.2d 121, 126 (Iowa 2023) ("In seeking to sustain an exception to the warrant requirement, the state bears

the burden of proof." (quoting *State v. Wilson*, 968 N.W.2d 903, 909 (Iowa 2022))). In this case, the State did not meet its burden because it failed to explain the twenty-five-minute delay between the time Waalkens heard back from state radio and the arrival of the drug dog, during which Waalkens should have been going over the paperwork discrepancies with Arrieta. It is not enough to prove that the inspection was still ongoing when the dog conducted the free air sniff. Rather, the State's burden of proving the stop was not extended beyond its lawful purpose required evidence showing that Waalkens could not reasonably have completed the inspection before Luther arrived. Thus, the State failed to justify the considerable delay to await the arrival of a drug dog, and, in the absence of reasonable suspicion, violated Arrieta's Fourth Amendment rights.

The State makes a passing argument that Waalkens's suspicions from Arrieta's logbook, the stolen vehicle report, and his travel along I-35 as a known drug route provided reasonable suspicion to support delaying Arrieta beyond the purpose for the initial stop. "When a person challenges a stop on the basis that reasonable suspicion did not exist, the State must show by a preponderance of the evidence that the stopping officer had specific and articulable facts, which taken together with rational inferences from those facts, to reasonably believe criminal activity may have occurred." *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004). We determine the existence of reasonable suspicion by considering the totality of the circumstances facing the officer. *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). But an officer's "[m]ere suspicion, curiosity, or hunch of criminal activity is not enough." *Tague*, 676 N.W.2d at 204.

In considering the circumstances of the stop, the factors identified by the State do not rise to the level needed to create reasonable suspicion that Arrieta was engaged in criminal activity. We considered whether reasonable suspicion justified prolonging a traffic stop to conduct a free air sniff in *Pardee* and came

to a similar conclusion on more facts. In *Pardee*, the officer identified several factors supporting reasonable suspicion, including "California plates, the slowing down to sixty-five miles per hour, the failure to make eye contact with the trooper, the oversight of leaving the right signal light on after pulling over, the initial nervousness [of the vehicle occupants], the lived-in look of the vehicle, [and] the air freshener [in the vehicle]." 872 N.W.2d at 394. We concluded that the trooper "developed reasonable suspicion of other criminal activity—if at all— only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings." *Id.* at 391.

Moreover, the stolen vehicle report cannot be considered among the circumstances supporting reasonable suspicion to continue holding Arrieta because Waalkens learned the truck was not stolen twenty-five minutes before Titan began his sniff around the truck. Once the issue had been resolved by the call from state radio, it could no longer be used to extend the stop. By Waalkens's own admission, the only task left before completing the inspection was reviewing the paperwork with Arrieta. There is no justification for why Waalkens delayed talking to Arrieta during the twenty-five minutes between resolving the discrepancy in the stolen vehicle report and Titan conducting the free air sniff. Therefore, Arrieta was improperly detained in violation of his Fourth Amendment rights when the free air sniff occurred, and any evidence obtained as a result of the search should have been suppressed.

**IV. Conclusion.**

The district court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**